# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Top Tobacco, L.P., et al.,

                    Plaintiffs,

                                Case No. 1:19-cv-4939-MLB

v.

Star Importers & Wholesalers, Inc.,
et al.,

                    Defendants.

_____/

Star Importers & Wholesalers, Inc.
& Amin S. Hudda,

                    Counterclaim
                    Plaintiffs,

v.

Top Tobacco, L.P., et al.,

                    Counterclaim
                    Defendants.

_____/

## OPINION & ORDER

Plaintiffs Top Tobacco, L.P. ("Top"), Republic Technologies (NA),

LLC ("Republic Technologies"), and Republic Tobacco, L.P. ("Republic")

are the owners and exclusive sellers in the United States of cigarette rolling papers sold and distributed under the trademarks TOP® and JOB®. They sued Defendants Ziya Business, Inc. d/b/a ZCell & Novelties ("ZCell") and Samadali Lakhani, asserting federal and state claims arising from Defendants' alleged sale of cigarette rolling papers that contained counterfeit trademarks. Plaintiffs move for summary judgment as to liability on all their claims, leaving the issues of willfulness, damages, and fees for trial. (Dkts. 185; 194.)[1] The Court grants that motion and Plaintiffs' request for a permanent injunction.

## I.    Background[2]

The Court draws the facts largely from the parties' submissions. In support of their motion for summary judgment, Plaintiffs filed a statement of material facts (Dkt. 200-1). *See* LR 56.1(B)(1), NDGa. Defendants responded to it and filed a separate statement of additional

---

[1] For the remainder of this opinion, if the parties filed both a redacted and an unredacted version of a document, the Court cites to the unredacted version. The Court notes the parties did not file both versions for all documents. (*See e.g.*, Dkts. 222-1; 185-7; 185-4; 88; 210; 213; 215; 222.)

[2] The page numbers on certain deposition transcripts do not match the page numbers applied by the CM/ECF system. The Court cites the CM/ECF page numbers for all docket entries.

facts they contend present genuine issues for trial.  (Dkts. 219-1 and 2.)
*See* LR 56.1(B)(2)(b).  Plaintiffs responded to that.  (Dkt. 222-1.)

The Court uses the parties' proposed facts and responses as follows.
When a party does not dispute the other's fact, the Court accepts it for
purposes of summary judgment and cites the proposed fact and
corresponding response.  When one side admits a proposed fact in part,
the Court includes the undisputed part.  When one side denies the other's
proposed fact in whole or in part, the Court reviews the record and
determines whether a fact dispute exists.  If the denial is without merit,
the Court deems the fact admitted so long as the record citation supports
it.  If a fact is immaterial, it is excluded.[3]  If a fact is stated as an issue or
legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where appropriate,
the Court modifies one party's fact per the other's response when the
latter better reflects the record.  Finally, as needed, the Court draws some

---

[3] Some proposed facts the Court declines to exclude on materiality
grounds are not "material" as that term is generally employed in the
summary judgment context.  *See Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986) (identifying material facts as those that "might
affect the outcome of the suit under the governing law").  Some are
included for background purposes or to generate context for the Court's
analysis.  Which facts ultimately prove material should be apparent from
the analysis.

facts directly from the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

### A.  Parties

Plaintiff Top owns the trademarks TOP®,  ®,  ®,

and ® for use in connection with cigarette rolling papers and related goods.  (Dkts. 200-1 ¶ 1; 219-1 ¶ 1.)  Plaintiff Republic Technologies owns the trademarks JOB®, ®, ®,

®, ®, and ® for use in connection with cigarette rolling papers and related goods.  (Dkts. 200-1 ¶ 2; 219-1 ¶ 2.)  Plaintiff Republic is the exclusive distributor in the United States of TOP- and JOB-brand cigarette rolling papers.  (Dkts. 200-1 ¶ 3; 219-1 ¶ 3.)  TOP® and JOB® products are manufactured exclusively for Republic and sold in the United States through Republic.  (Dkts. 200-1

4

¶ 4; 219-1 ¶ 4.)  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████  (Dkts. 200-1 ¶ 10; 219-1 ¶ 10.)  By volume of leaves, TOP

is the leading brand of roll-your-own tobacco in the United States.  (Dkts.

200-1 ¶ 11; 219-1 ¶ 11.)  It has been sold in the United States since

December 1900.  (Dkts. 200-1 ¶ 12; 219-1 ¶ 12.)  Republic and its

predecessors have continuously used the TOP® trademark to sell

cigarette papers in the United States since at least since 1942.  (Dkts.

200-1 ¶ 13; 219-1 ¶ 13.)

Republic Technologies and its predecessors have used the JOB®

mark continuously for over 150 years in connection with cigarette rolling

papers.  (Dkts. 200-1 ¶ 14; 219-1 ¶ 14.)  JOB® papers are the longest-

selling cigarette rolling papers in the United States.  (Dkts. 200-1 ¶ 15;

219-1 ¶ 15.)  The TOP® and JOB® brands are among the best-known

brands of cigarette rolling papers in the United States.[4]  (Dkts. 200-1

---

[4] After reviewing the record, the Court agrees with Defendants that
Plaintiffs' citations do not support their entire purported fact.  But their
citations do support the fact as stated in this order.

¶ 16; 219-1 ¶ 16.)   Plaintiffs sell genuine TOP® and JOB® papers to several customers in the Atlanta area.  (Dkts. 200-1 ¶ 17; 219-1 ¶ 17.)

Defendant ZCell is a Georgia corporation.  (Dkts. 200-1 ¶ 5; 219-1 ¶ 5.)   It sells general merchandise and novelty items to convenience stores and gas stations in the Atlanta area.  (Dkts. 200-1 ¶ 63; 219-1 ¶ 63.)

(Dkts. 200-1 ¶ 66; 219-1 ¶ 66.)

(Dkts. 200-1 ¶ 67; 219-1 ¶ 67.)

Defendant Samad Lakhani is ZCell's CEO, sole owner, and only officer.  (Dkts. 200-1 ¶¶ 6–7; 219-1 ¶¶ 6–8; 219-2 ¶ 2.)[5]

---

[5] Plaintiffs object to certain facts in Defendants' statement of facts as not in compliance with the Local Rules because they are alternative facts, rather than additional facts.  (*See, e.g.*, Dkt. 222-1 ¶¶ 1–2.)  The Court agrees.  The Local Rules permit a respondent to submit "[a] statement of *additional* facts which the respondent contends are material and present a genuine issue for trial."  LR 56.1(B)(2)(b) (emphasis added).  Where appropriate, however, the Court uses one party's fact when it is better said.

### B.   Trademarks

Top owns and maintains several federal trademark registrations for the TOP® marks, including, among others, U.S. Registration Nos. 2739465, 2831105, 3677986, and 3677987 for cigarette rolling papers, Nos. 2293958 and 2739466 for smoking tobacco, Nos. 3407400 and 3720176 for cigarette making machines, No. 3710606 for tobacco, and No. 3918139 for pocket machines for rolling cigarettes for personal use. (Dkts. 200-1 ¶ 19; 219-1 ¶ 19.)  Each TOP® registrations remains valid. (Dkts. 200-1 ¶ 20; 219-1 ¶ 20.)

Republic Technologies also owns numerous federal trademark registrations for the JOB® marks including, among others, U.S. Registration Nos. 73124, 1341384, 1357088, 3834324, 4019091, and 4019093 for cigarette papers. (Dkts. 200-1 ¶ 22; 219-1 ¶ 22.)  Each of them remains valid. (Dkts. 200-1 ¶ 23; 219-1 ¶ 23.)

### C.   Plaintiffs' Products

TOP® and JOB® cigarette rolling papers are manufactured in Perpignan, France. (Dkts. 200-1 ¶ 25; 219-1 ¶ 25.)  No legitimate TOP® or JOB® cigarette rolling papers are manufactured outside of France. (Dkts. 200-1 ¶ 26; 219-1 ¶ 26.)  Plaintiffs' laboratory in France thus

knows the exact composition of genuine TOP® and JOB® papers.[6]  (Dkts. 200-1 ¶ 27; 219-1 ¶ 27.)

Plaintiffs sell their TOP® and JOB® products in the United States to wholesalers and retailers.  (Dkts. 200-1 ¶ 30; 219-1 ¶ 30.) ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████  (Dkts. 200-1 ¶ 31; 219-1 ¶ 31.)  Plaintiffs sell TOP® and JOB® brand papers in different sizes, packaging, and volume.  (Dkts. 200-1 ¶ 32; 219-1 ¶ 32.)  Plaintiffs, for example, sell promotional jars of TOP® papers containing 120 booklets or 144 booklets.  (Dkts. 200-1 ¶ 33; 219-1 ¶ 33.)  They do not sell them in 100-count jars.  (Dkts. 200-1 ¶ 34; 219-1 ¶ 34.)  The TOP® product packaging features the TOP marks in multiple locations, including on all sides of the carton, on the top and bottom of individual booklets, and even on the inner flap of each booklet.  (Dkts. 200-1 ¶ 35; 219-1 ¶ 35.)  Sachin Lele, Plaintiffs' general counsel, testified by declaration that the distinctive product packaging for TOP® products is immediately recognizable, including its use of the TOP®

---

[6] After reviewing the record, the Court agrees with Defendants that Plaintiffs' citations do not support their entire purported fact.  But their citations do support the fact as stated in this order.

marks (including use of the ® symbol), Top's characteristic light yellow color packaging, Top's well-known blue stylized logo, and a red, yellow, and blue drawing of a top.[7] (Dkts. 200-1 ¶ 36; 219-1 ¶ 36.) A consumer looking to purchase TOP® products would have no reason to believe products bearing those marks on the packaging are not genuine products.[8] (Dkts. 200-1 ¶ 53; 219-1 ¶ 53.)

---

[7] Defendants deny Plaintiffs' factual assertion and others like it, arguing they imply counterfeit products are not immediately recognizable. (Dkt. 219-1 ¶¶ 36, 51, 52.) To the extent the fact has such implication, the Court draws all inferences in Defendants' favor.

[8] Defendants object to Plaintiffs' reliance on purported customer complaints as hearsay statements when no exception has been established. (Dkt. 219-1 ¶ 53.) It asserts a similar objection to other alleged hearsay statements. (*Id.* ¶¶ 53, 112, 115–117, 173.) While courts cannot rely on inadmissible hearsay to decide a motion for summary judgment, courts can rely on evidence that can be "reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999) (quotations omitted).

> District courts in this Circuit have held that statements by customers offered to establish confusion in trademark litigation when offered to prove the truth of the belief of the declarant is properly classified as hearsay. However, such statements are deemed admissible because they fall within Fed. R. Evid. 803(3), the state of mind exception to the hearsay rule.

*Silverton Mortg. Specialists, Inc. v. FDIC for Silverton Bank, N.A.*, No. 1:09-cv-1583, 2012 WL 13001592, at *19 (N.D. Ga. Sept. 28, 2012). The Court thus overrules Defendants' objections.

Plaintiffs also sell various paper products using the JOB® brand, including JOB® Gold, JOB® Orange, and Job® French White. (Dkts. 200-1 ¶¶ 37–38; 219-1 ¶¶ 37–38.) They do this in packages of various sizes, including jars of JOB® Gold papers containing 100 booklets. (*Id.*) Plaintiffs' JOB® Gold papers come in various sizes, including JOB® Gold 1.25 papers and JOB® Gold 1.5 papers. (Dkts. 200-1 ¶ 39; 219-1 ¶ 39.) Plaintiffs sell two versions of their JOB® Gold 1.25 and JOB® Gold 1.5 papers: booklets that are pre-priced for $1.69 and booklets that are not pre-priced. (Dkts. 200-1 ¶ 40; 219-1 ¶ 40.) Genuine pre-priced booklets are a promotional product that Plaintiffs offer only in 100-count jars or metal tins. (Dkts. 200-1 ¶ 41; 219-1 ¶ 41.) Plaintiffs only sell these promotional items in limited quantities to their exclusive customers once or twice a year. (Dkts. 200-1 ¶ 42; 219-1 ¶ 42.) They do not sell them in boxes.[9] (Dkts. 200-1 ¶ 43; 219-1 ¶ 43.) They also sell non-pre-priced

---

[9] Defendants deny this fact, contending non-Plaintiff distributors can re-package and re-sell papers in any quantity. (Dkt. 219-1 ¶ 43.) ███████████████████████████████████████████████ (Dkt. 190-1 at 41:21– 42:3.) Plaintiffs' fact, however, relates to *Plaintiffs* selling pre-priced JOB® Gold 1.25 $1.69 and JOB® Gold 1.5 $1.69 papers. (Dkt. 200-1 ¶ 43.) ████████████████████████████████████████████

JOB® Gold boxes that are prominently marked with JOB® marks. (Dkts. 200-1 ¶ 44; 219-1 ¶ 44.)

Plaintiffs also sell two versions of JOB® 1¼ Orange papers: booklets that are pre-priced for 99¢ and booklets that are not pre-priced. (Dkts. 200-1 ¶ 45; 219-1 ¶ 45.) Plaintiffs sell the pre-priced booklets in jars containing 100 booklets. (Dkts. 200-1 ¶ 46; 219-1 ¶ 46.) Plaintiffs also sell them in refillable boxes of 100 booklets. (Dkts. 200-1 ¶ 47; 219-1 ¶ 47.) All these items are prominently marked with Republic Technologies' JOB® marks. (Dkts. 200-1 ¶ 48; 219-1 ¶ 48.)

The JOB® product packaging prominently displays the JOB® marks in multiple locations, including on all sides of the carton, on the top and bottom of individual booklets, on the inner flap of each booklet, and embossed on the leaves themselves. (Dkts. 200-1 ¶ 50; 219-1 ¶ 50.) Mr. Lele testified by declaration that the product packaging for JOB® Gold products includes the prominent use of the JOB® marks (including



(Dkts. 219-2 ¶¶ 3–5; 222-1 ¶¶ 3–5.) (Dkts. 219-2 ¶¶ 9–10, 33; 222-1 ¶¶ 9–10, 33.)

use of the ® symbol), a characteristic gold color, and a well-known red-and-blue logo with red and blue filigree designs in the corners. (Dkts. 200-1 ¶ 51; 219-1 ¶ 51.) Mr. Lele also testified by declaration that the product packaging for JOB® Orange products includes the prominent use of the JOB® marks (including use of the ® symbol), a characteristic red color, and a well-known black-and-gold logo with black filigree designs on the top and bottom. (Dkts. 200-1 ¶ 52; 219-1 ¶ 52.) A consumer looking to purchase JOB® products would have no reason to believe that products bearing those marks and other indicia on the product packaging are not genuine products. (Dkts. 200-1 ¶ 53; 219-1 ¶ 53.)

## D.  Anti-Counterfeiting

Plaintiffs have discovered counterfeit cigarette rolling papers bearing the TOP® and JOB® marks being sold in the same channels as authentic TOP® and JOB® products. (Dkts. 200-1 ¶ 54; 219-1 ¶ 54.) Manufacturers of counterfeit cigarette rolling papers have become so adept at copying Plaintiffs' TOP® and JOB® marks and product packaging that the average consumer often cannot tell the difference

between authentic and counterfeit booklets based on packaging alone.[10] (Dkts. 200-1 ¶ 57; 219-1 ¶ 57.)   To combat counterfeiting, Plaintiffs engage private investigators to investigate tips from consumers, customers, employees, other sellers, and confidential sources; coordinate with law enforcement when possible; and publicize their anti-counterfeiting efforts.  (Dkts. 200-1 ¶¶ 59–61; 219-1 ¶¶ 59–61.)

### E.   Defendants ZCell and Lakhani and Third-Party Defendant TN Vape

ZCell sells cigarette papers bearing the TOP® and JOB® marks to its customers.  (Dkts. 200-1 ¶ 68; 219-1 ¶ 68.)   JOB® papers are ZCell's bestselling rolling papers.  (Dkts. 200-1 ¶ 69; 219-1 ¶ 69.)   Republic has never sold TOP® and JOB® products directly to ZCell or Defendant Lakhani.  (Dkts. 200-1 ¶ 70; 219-1 ¶ 70.)   ZCell first started carrying TOP® and JOB® products in approximately 2013 or 2014.  (Dkts. 200-1 ¶ 71; 219-1 ¶ 71.)

---

[10] Defendants object for lack of foundation, speculation, and improper opinion.  (Dkt. 219-1 ¶ 57.)  The Court overrules that objection since the customer complaints support this fact.  (Dkt. 194-3 at 126–46.)  The Court notes Defendants themselves rely on this fact to show Plaintiffs admit counterfeit papers appear authentic.  (Dkt. 219-1 ¶¶ 36, 51–52.)

Defendants have purchased TOP® and JOB® papers from several companies. (Dkts. 200-1 ¶ 75; 219-1 ¶ 75; 187-1 at 32:23–25.)  Initially, they purchased from a company identified as Sessions, which buys directly from Republic.[11] (Dkts. 200-1 ¶ 76; 219-1 ¶ 76; 219-2 ¶ 17; 222-1 ¶ 17.)  But, from October 2017 through May 14, 2019, Defendants purchased TOP® and JOB® products primarily from Third-Party Defendants Alex Seriana and his company (TN Vape). (Dkts. 200-1 ¶ 77; 219-1 ¶ 77.)  ZCell first met TN Vape at a trade show. (Dkt. 187-1 at 35:3–9.)  Defendant ZCell (through Defendant Lakhani) testified the company had no specific recollection about that conversation. (Dkts. 200-1 ¶ 85; 219-1 ¶ 85.)  After the trade show, Mr. Seriana traveled to Defendants' store to purchase some other products. (Dkts. 219-2 ¶ 12; 222-1 ¶ 12.)  Defendant ZCell testified, either at the trade show or at that subsequent meeting, TN Vape claimed it was an authorized distributor

---

[11] Defendants objected to Plaintiffs' fact contending their citation supports the fact that Sessions in an exclusive distributor, not an exclusive customer. (Dkt. 219-1 ¶ 76.)  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkts. 219-2 ¶ 17; 222-1 ¶ 17 (emphasis added).)  The Court thus considers the fact admitted.

for TOP® and JOB® rolling papers.[12]  (Dkt. 187-1 at 53:7–9.)  TN Vape

has never been an exclusive distributor of Republic.  (Dkts. 200-1 ¶ 87;

219-1 ¶ 87; ███████████████.)

Defendant ZCell testified that TN Vape was able to fill ZCell's

orders for TOP- and JOB-branded papers when Sessions could not.

(Dkts. 200-1 ¶ 78; 219-1 ¶ 78.)  Defendant ZCell testified it had seen and

was familiar with the appearance and pricing of authentic TOP® and

JOB® papers since it had previously purchased the products from

Sessions and others.  (Dkts. 200-1 ¶ 79; 219-1 ¶ 79.)  In 2019, Sessions

sold ZCell promotional jars of JOB® Gold 1.25 $1.69 and JOB® Gold 1.5

$1.69 papers for $91.50 per jar.[13]   (Dkts. 200-1 ¶ 80; 219-1 ¶ 80.)

Defendant ZCell testified that Sessions offered a good price because ZCell

---

[12] Plaintiffs contend Defendant ZCell was unprepared to testify about the alleged communications between Defendants and TN Vape leading to their supplier relationship.  (Dkts. 222-1 ¶ 13.)  But Defendant ZCell testified clearly that TN Vape claimed to be an authorized distributor for TOP® and JOB® papers.  (Dkt. 187-1 at 53:7–9.)

[13] In 2017, Defendants purchased JOB® 1.5 jars and 1.25 jars from Sessions for $87.50.  (Dkts. 219-2 ¶ 20; 222-1 ¶ 20.) ███████████████

███████████████          (Dkts. 219-2 ¶ 22; 222-1 ¶ 22.)

sold the promotional jars for resale at $98-100 per jar.[14]    (Dkts. 200-1 ¶ 81; 219-1 ¶ 81.)  TN Vape, however, sold ZCell the promotional jars for about $86.50 per jar.  (Dkts. 200-1 ¶ 82; 219-1 ¶ 82.)  Defendant ZCell agreed that the difference in Sessions' price and TN Vape's price was "pretty big." (Dkts. 200-1 ¶ 83; 219-1 ¶ 83.)

According to Defendants' records, from October 2017 through May 14, 2019, Defendants purchased $200,500.50 worth of TOP- and JOB-branded inventory from TN Vape, including TOP-branded papers, promotional pre-priced JOB Gold 1.25 $1.69 and JOB Gold $1.69 papers, and promotional pre-priced JOB Orange 99c papers.[15]  (Dkts. 200-1 ¶ 92; 219-1 ¶ 92.)  ZCell normally purchased TOP- and JOB-branded products

---

[14] ███████████████████████████████████████████████ (Dkts. 219-2 ¶ 21; 222-1 ¶ 21.)    Plaintiffs testified that Birmingham Wholesale was not an exclusive customer in 2018 through May 2019.  (Dkt. 190-1 at 84:24–85:9.)

[15] TN Vape, through its 30(b)(6) representative Mr. Seriana, testified it had no reason to believe the items it sold were counterfeit. (Dkts. 219-2 ¶ 19; 222-1 ¶ 19.)  Plaintiffs object to that statement as an impermissible legal conclusion. (Dkt. 222-1 ¶ 19.)  The Court disagrees and considers the fact admitted. *See Walden v. Verizon Bus. Network Servs., Inc.*, No. 1:06-cv-2394, 2008 WL 269619, at *9 & n.13 (N.D. Ga. Jan. 29, 2008) (factual assertion plaintiff had no reason to think defendants' decision to not let her return to work had anything to do with plaintiff's pregnancy not a legal conclusion).

from TN Vape in jars that looked like the jars Sessions sold it.  (Dkts. 200-1 ¶ 93; 219-1 ¶ 93.)   TN Vape delivered TOP- and JOB-branded products from Tennessee to the ZCell's warehouse in a white box truck. (Dkts. 200-1 ¶ 94; 219-1 ¶ 94.)   It packaged them in plain, unmarked cardboard boxes.  (Dkts. 200-1 ¶ 95; 219-1 ¶ 95.)  Defendant ZCell admits it purchased JOB Orange papers packaged in plain white boxes.  (Dkts. 200-1 ¶ 96; 219-1 ¶ 96.)  Defendant ZCell also admitted to filling jars with JOB Orange booklets from white boxes since its customers prefer the jars.  (Dkts. 200-1 ¶ 97; 219-1 ¶ 97.)  Plaintiffs do not sell genuine JOB® Orange papers in plain white boxes.  (Dkts. 200-1 ¶ 98; 219-1 ¶ 98.)  In negotiating with TN Vape, Defendant ZCell's employee, Riyaz Merchant, bluffed about buying directly from Plaintiffs to negotiate a lower price for JOB® Orange papers.  (Dkts. 200-1 ¶ 100; 219-1 ¶ 100.)   Defendant Lakhani instructed Mr. Merchant to tell TN Vape that ZCell could "get [the] same price from [the] company."  (Dkts. 200-1 ¶ 101; 219-1 ¶ 101.)

ZCell promotes its sales of TOP® and JOB® products through flyers printed for trade shows twice a year, and through continual, year-round flyers distributed directly to retailers.  (Dkts. 200-1 ¶ 102; 219-1 ¶ 102.)

██████████████████████████████████

████████████████████████████  (Dkts. 200-1 ¶ 103; 219-1

¶ 103.)  ZCell has sold counterfeit products bearing the TOP® and JOB®

marks.  (Dkts. 200-1 ¶ 113; 219-1 ¶ 113.)

Defendant Lakhani supervises his company's purchases and sales,

handles its accounts, and is responsible for the company's overall

performance.  (Dkts. 200-1 ¶ 104; 219-1 ¶ 104.)  He oversees ZCell's

fifteen employees.  (Dkts. 200-1 ¶ 105; 219-1 ¶ 105.)  Defendant Lakhani

is personally involved in negotiating prices.  (Dkts. 200-1 ¶ 106; 219-1

¶ 106.)  When ZCell orders from a new supplier, Defendant Lakhani

handles the initial negotiations.  (Dkts. 200-1 ¶ 107; 219-1 ¶ 107.)

Defendant Lakhani decided what to order from TN Vape, instructed

ZCell's manager (Mr. Merchant) to place orders, and gave approval for

each order.  (Dkts. 200-1 ¶ 108; 219-1 ¶ 108.)

## F.   Test Buys and Raid

In December 2016, a company known as Five A. Trading received a

flyer from ZCell advertising promotional jars of pre-priced JOB® Gold 1.5

$1.69 papers.  (Dkts. 200-1 ¶ 109; 219-1 ¶ 109.)  Five A ordered 20

promotional jars from ZCell.  (Dkts. 200-1 ¶ 110; 219-1 ¶ 110.)  After

receiving the papers from ZCell, the company's owner (Ayaz Ali) called a Republic broker to ask how a non-exclusive distributor was able to obtain promotional jars for resale.[16]   (Dkt. 185-7 ¶ 13.) ████████████

████████████████████████████████████████████████

████████████████   (Dkts. 219-2 ¶ 24; 222-1 ¶ 24.)  ████████████

██████████████████████████████████████   (Dkts. 219-2 ¶ 25; 222-1 ¶ 25.)

In May 2018, a customer notified Plaintiffs that ZCell was selling TOP® and JOB® products at an unrealistic price.  (Dkts. 200-1 ¶ 112; 219-1 ¶ 112.)  ████████████████████████████████████

█████████████████████   (Dkts. 219-2 ¶¶ 27–28; 222-1 ¶¶ 27–28.)  On February 6, 2019, one of Plaintiffs' investigators, Victor Hartman, supervised an undercover buy of TOP® and JOB® rolling papers at the ZCell Warehouse by one of his confidential informants.  (Dkts. 200-1 ¶ 114; 219-1 ¶ 114.)  Mr. Hartman gave the informant $400 for the purchase, watched the informant go into the warehouse, saw him exit

---

[16] Defendants contend Plaintiffs' citation does not support the factual assertion in this paragraph.  (Dkt. 219-1 ¶ 111.)  The Court agrees.  The Court thus draws this fact directly from the cited evidence.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

with a box, and took custody of the box from the informant. (Dkts. 200-1 ¶¶ 115–17; 219-1 ¶¶ 115–17.)  Mr. Hartman completed a chain of custody and shipped the samples to France for testing.[17]   (Dkt. 185-4 ¶ 12.) Marine Teisseyre, a laboratory technician at Republic Technologies in France, determined the items purchased from ZCell are counterfeit. (Dkts. 200-1 ¶¶ 124–26; 219-1 ¶¶ 124–26.)

In April 2019, Plaintiffs coordinated with one of their customers, Midwest Wholesale LLC ("Midwest"), to buy larger quantities of TOP® and JOB® papers from Defendant ZCell.  (Dkts. 200-1 ¶ 127; 219-1 ¶ 127.)  After completing that purchase, Midwest sent the samples to Plaintiffs, and Plaintiffs sent them to France for testing.[18] (Dkts. 200-1

---

[17] Defendants contend Mr. Hartman's declaration fails to lay foundation for the chain of custody document, primarily because the documents were signed by other people. (Dkt. 219-1 ¶ 119.)  But Mr. Hartman may lay a foundation for the document as a business record of his company.  Fed. R. Evid. 803(6); *see also Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980) ("Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records.").  Defendants may explore any issue regarding other signatories through cross examination as "[t]he absence or extent of personal knowledge regarding preparation of a business record affects the weight rather than the admissibility of the evidence." *Chadwick v. Bank of Am., N.A.*, 616 F. App'x 944, 948 (11th Cir. 2015).
[18] Defendants contend Mr. Lele's declaration fails to establish his personal knowledge about when Plaintiffs received the samples from

¶¶ 129–30; 219-1 ¶¶ 129–30; 194-3 ¶ 55.)  Ms. Teisseyre confirmed they are counterfeit.  (Dkts. 200-1 ¶¶ 131–33; 219-1 ¶¶ 131–33.)

The DeKalb County Police Department ("DCP") began investigating ZCell for trafficking in counterfeit goods.  (Dkts. 200-1 ¶ 134; 219-1 ¶ 134.)  In April 2019, Plaintiffs began coordinating their efforts with the police, providing information about TOP® and JOB® products and cooperating with police to get a search warrant for ZCell's warehouse.  (Dkts. 200-1 ¶ 135; 219-1 ¶ 135.)  An undercover agent and private investigator employed by a company known as Gatekeeper Global, LLC ("Gatekeepers") made a third test purchase of TOP® and JOB® products from ZCell on May 3, 2019.  (Dkts. 200-1 ¶ 136; 219-1

---

Midwest.  (Dkt. 219-1 ¶ 129.)  The exact date is immaterial and Mr. Lele explained in his declaration that he based his statements on knowledge he acquired as Plaintiffs' general counsel and from company documents.  "To be sufficient, a declaration must be based on personal knowledge." *Duke v. Nationstar Mortg., L.L.C.*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012).  The affidavit or declaration must also state the basis for such personal knowledge.  *See Bruce Constr. Corp. v. United States for Use of Westinghouse Elec. Supply Co.*, 242 F.2d 873, 877 (5th Cir. 1957).  The Court overrules Defendants' objection.  Defendants also contend Exhibit G to Mr. Lele's declaration, a purported chain of custody document, is inadmissible hearsay and Mr. Lele's declaration fails to lay the foundation for its admissibility.  The Court sees no indication Mr. Lele would be unavailable to lay a foundation at trial.  The Court thus overrules this objection as well.

¶ 136.)   Gatekeepers sent samples to Plaintiffs, Plaintiffs sent them to the lab, and the lab confirmed they are counterfeit.[19]   (Dkts. 200-1 ¶¶ 138–141; 219-1 ¶¶ 138–141.)

On May 7, 2019, DCPD searched ZCell's warehouse.[20]   (Dkts. 200-1 ¶ 143; 219-1 ¶ 143; 194-4 ¶¶ 23–24, 26–27.)   Defendants had empty clear jars, like those Plaintiffs use to package genuine TOP® and JOB® products.   (Dkts. 200-1 ¶ 145; 219-1 ¶ 145.)   Mr. Lele testified by declaration that he was present during the search and saw empty boxes of JOB-branded rolling papers unpackaged without a seal near the jars. (Dkts. 200-1 ¶ 146; 219-1 ¶ 146.)   Authentic jars of JOB® rolling papers have a seal affixed.   (Dkts. 200-1 ¶ 147; 219-1 ¶ 147.)   DCPD seized a number of products.[21]   (Dkts. 200-1 ¶ 149; 219-1 ¶ 149.)   Defendant ZCell

---

[19] Defendants contend Exhibit B attached to Tim Clark's and Guy Watkins' affidavits, which is relied upon for this fact, is a purported chain of custody document signed by a number of individuals.   (Dkt. 219-1 ¶ 138.)   Exhibit B, however, is only signed by Mr. Watkins, one of the declarants.   (Dkt. 194-5 at 11.)   The Court thus takes this fact as undisputed.

[20] Plaintiffs' fact identifies the incorrect warehouse.   (Dkt. 200-1 ¶ 143.) The cited evidence, however, shows that the execution of the search warrant occurred at multiple locations, including the ZCell warehouse. (Dkt. 194-4 ¶¶ 21–30.)

[21] The Court acknowledges there is a dispute as to what was seized, but the specific nature of the products is immaterial.   (Dkts. 200-1 ¶ 149; 219-1 ¶ 149.)

testified that it purchased the seized products from TN Vape.[22]  (Dkts. 200-1 ¶ 99; 219-1 ¶ 99; 187-1 at 258:5–12.)  Plaintiffs sent samples of the seized items to its laboratory and Ms. Teisseyre confirmed they are counterfeit.[23]  (Dkts. 200-1 ¶¶ 154–158; 219-1 ¶¶ 154–158.)

The February, April, May, and raid samples obtained from ZCell purporting to be genuine TOP® and JOB® cigarette rolling papers include labels, graphics, and logos which are confusingly similar to, and/or are colorable imitations of, the authentic TOP- and JOB-branded products.  (Dkts. 200-1 ¶ 164; 219-1 ¶ 164.)  These samples also do not match the specification of authentic TOP® and JOB® products.  (Dkts. 200-1 ¶ 165; 219-1 ¶ 165.)  Based on chemical, visual, and physical differences between authentic TOP® and JOB® papers and the

---

[22] Defendants contend Plaintiffs' citation does not support the factual assertion in this paragraph.  (Dkt. 219-1 ¶ 99.)  The Court partially agrees.  The Court thus draws this fact directly from the cited evidence.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[23] Defendants contend Exhibit G attached to Mr. Clark's affidavit, which is relied upon for this fact, is a purported chain of custody document signed by a number of individuals.  (Dkt. 219-1 ¶ 154.)  Exhibit G, however, is not signed by any of the individuals Defendants list.  (Dkt. 194-4 at 37–44.)  Mr. Clark was also the individual who relinquished the raid samples to Republic Technologies (France) SAS and the Court sees no indication as to why he cannot testify about this relinquishment.

February, April, May, and raid samples, Ms. Teisseyre confirmed all the samples are counterfeit.  (Dkts. 200-1 ¶ 182; 219-1 ¶ 182.)

### G.    Harm and Confusion

The counterfeit cigarette rolling papers bearing the TOP® and JOB® marks sold by Defendants are of lesser quality than Plaintiffs' genuine papers.  (Dkts. 200-1 ¶ 166; 219-1 ¶ 166.)  Top is a long-time signatory to the Master Settlement Agreement between the Attorneys General of the numerous settling states and participating manufacturers of tobacco products.  (Dkts. 200-1 ¶ 167; 219-1 ¶ 167.)  Republic abides by the market restrictions of that agreement.  (Dkts. 200-1 ¶ 167; 219-1 ¶ 167.)  Plaintiffs have taken steps to ensure their products comply with other applicable laws and regulations regarding the marketing and manufacturing of smokers' articles.  (Dkts. 200-1 ¶ 168; 219-1 ¶ 168.) Plaintiffs have submitted all of their products to and registered their ingredients with the FDA pursuant to the Family Smoking Prevention and Tobacco Control Act.  (Dkts. 200-1 ¶ 169; 219-1 ¶ 169.)

In the past several years, Plaintiffs have received an increased number of customer complaints about the poor quality of cigarette rolling papers purporting to be TOP® and JOB® papers.  (Dkts. 200-1 ¶ 173;

219-1 ¶ 173.)  When Plaintiffs can obtain papers subject to a customer complaint, Plaintiffs test them to see if they are counterfeit.  (Dkts. 200-1 ¶ 174; 219-1 ¶ 174.)  Plaintiffs have suffered irreparable harm as a result of the inability to control the quality of the counterfeit cigarette rolling papers purporting to be TOP® and JOB® products sold by Defendants.  (Dkts. 200-1 ¶ 179; 219-1 ¶ 179.)  The sale of counterfeit TOP® and JOB® cigarette rolling papers causes significant economic lose to Republic and its affiliates each year.  (Dkts. 200-1 ¶ 180; 219-1 ¶ 180.)

### H.    The Lawsuit

Plaintiffs sued Defendants for their involvement in the purchase, sale, and distribution of counterfeit papers.  (Dkt. 88.)  They asserted claims against Defendants under the Lanham Act, 15 U.S.C. § 1051 et seq., for trafficking in counterfeit goods, federal trademark infringement, and unfair competition and false design origin.  They also asserted claims for Georgia statutory unfair competition under O.C.G.A. §§ 23-2-55 et seq.; deceptive trade practices under O.C.G.A. §§ 10-1-372 et seq.; common law trademark infringement; common law unfair competition; and common law unjust enrichment.  (*Id.* at 23–40.)  Plaintiffs also

requested entry of a permanent injunction against Defendants. (*Id.* at 41–42.)

Plaintiffs move for partial summary judgment as to liability, arguing a trial is necessary only to determine willfulness, damages, and fees. (Dkt. 185.) Defendants responded, arguing an issue of material fact exists as to whether they sold counterfeit rolling papers. (Dkt. 207 at 8.) Defendants argued that Plaintiffs' evidence that Defendants sold counterfeit papers relied on a declaration from Ms. Teisseyre about the analysis she did on the papers purchased or seized from Defendants during Plaintiffs' investigation. (*Id.*) Defendants argued the Court should strike Ms. Teisseyre's declaration because she was offering expert testimony and Plaintiff had not properly disclosed her as an expert or provided her expert report as required by the Federal Rules of Civil Procedure and this Court's Local Rule. (*Id.* at 9.) Simultaneous with responding to summary judgment, Defendants filed a motion to strike Ms. Teisseyre's expert declaration on the same grounds. (Dkt. 210.)

Defendants were wrong. When Plaintiffs responded to the motion to strike, showing they had disclosed Ms. Teisseyre as an expert in their Initial Disclosures and provided the necessary report (Dkt. 213),

Defendants withdrew their motion to strike.  (Dkt. 215.)  Defendants also filed a revised response to Plaintiffs' motion for summary judgment, abandoning their claim that Plaintiffs failed to show they were entitled to summary judgment as to liability against Defendant ZCell, other than to argue a material fact exists as to whether Plaintiffs' claims are barred by the doctrine of laches.  (Dkt. 219.)  Defendants also assert Plaintiffs are not entitled to summary judgment against Defendant Lakhani.  (*Id.*)

## II.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson*, 477 U.S. at 248).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is

no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.*  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).

Throughout its analysis, the Court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc)).  "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes

of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## III.   Discussion

### A.   Infringement

Claims for federal counterfeiting and trademark infringement, 15 U.S.C. § 1151, and for unfair competition and false designation of origin (based upon trademark violation), 15 U.S.C. § 1125(a)(1), have the same elements.  *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 n.14 (11th Cir. 1989); s*ee also Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) ("We, like other circuits, often blur the lines between [Lanham Act infringement] claims and [Lanham Act false designation of origin] claims because recovery under both generally turns on the confusion analysis.").  To prove either form of a Lanham Act violation, Plaintiffs must show: (1) they own valid marks entitled to protection, (2) Defendants used Plaintiffs' marks in commerce, and (3) Defendants' marks are likely to cause consumer confusion. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001).  The same elements govern Plaintiffs' claims for violations of Georgia's Unfair Competition Statute, Georgia's Uniform

Deceptive Trade Practices Act, and common law trademark infringement and unfair competition. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 n.11 (11th Cir. 2007) ("[T]he analysis of a Georgia unfair competition claim is 'co-extensive' with the analysis of a Lanham Act claim."); *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997) ("It should be apparent that § 43(a) of the Lanham Act and § 10-1-372(a)(2) of the UDTPA provide analogous causes of action governed by the same standard."); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985) ("[T]he standards governing most of the claims under Georgia law are similar, if not identical, to those under the Lanham Act.").

### 1.   Defendant ZCell's Liability

Plaintiffs have produced evidence showing they own protectable trademarks in JOB® and TOP®, and Defendants do not challenge Plaintiffs' ownership. (Dkts. 200-1 ¶¶ 1–2, 13, 19–20, 22–23; 219-1 ¶¶ 1–2, 13, 19–20, 22–23.)   Plaintiffs have also produced evidence showing Defendants sold counterfeit marks and the marks were likely to confuse consumers. (Dkts. 200-1 ¶¶ 68, 71–75, 77, 92, 99, 103, 110, 113–14, 124–28, 131–33, 136–41, 165, 182, 57, 112, 164, 173; 219-1 ¶¶ 68, 71–75, 77,

92, 99, 103, 110, 113–14, 124–28, 131–33, 136–41, 165, 182, 57, 112, 164, 173.)  Defendants also do not challenge these contentions.  (*See generally* Dkt. 219.)  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)).  "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Id.* (citing *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).  Defendants abandoned their arguments as to any of the three elements of trademark infringement.  The Court, having reviewed the undisputed facts put before it, concurs that Plaintiffs have shown an absence of genuine dispute that they own valid marks entitled to protection, Defendants used Plaintiffs' marks in commerce, and Defendants' counterfeit marks are likely to cause consumer confusion.

Defendants nevertheless say Plaintiffs are not entitled to summary judgment because a triable issue exists on Defendants' laches affirmative

defense.  (Dkt. 219 at 17.)  Because a defendant bears the burden of proof on any affirmative defenses at trial, *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550–51 (11th Cir. 1990), on a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable.  *Weitz*, 913 F.2d at 1552; *see also Johnson v. Board of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (finding because plaintiffs moved for final summary judgment, it was incumbent on intervenors to respond by raising any and all defenses they felt precluded judgment in plaintiffs' favor (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 734 F. Supp. 1076, 1090–91 (D. Del. 1990) (finding burden on defendant to adduce evidence supporting an affirmative defense, not upon movant to negate its existence))).  Upon such a showing, the burden shifts to plaintiff regarding that affirmative defense.  *Weitz*, 913 F.2d at 1552 n.13.

Estoppel by laches may be raised as an equitable defense to trademark infringement when a party has unreasonably delayed in bringing its claims.  *Kason*, 120 F.3d at 1203.  To prevail on this defense, Defendants must show: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue

prejudice to the party against whom the claim is asserted." *Id.* (citing *AmBrit. Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)). The test for laches is flexible, requiring a careful examination of both the delay and the prejudice caused by that delay. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1517 (11th Cir. 1984). "Laches is invoked when the delay in commencing a lawsuit exceeds the statute of limitation for an analogous state law claim, which for this trademark action is the four-year limitation period applied to an action under the Georgia Deceptive Trade Practices Act." *Groucho's Franchise Sys., LLC v. Grouchy's Deli, Inc.*, 683 F. App'x 826, 829 (11th Cir. 2017). "Delay is measured from the time the plaintiff knew or should have known that it had a provable claim for infringement, but it is under no obligation to sue until the likelihood of confusion looms large." *Buccellati Holding Italia SPA v. Laura Buccellati, LLC,* 5 F. Supp. 3d 1368, 1375 (S.D. Fla. 2014) (citing *Kason*, 120 F.3d at 1206). Courts weigh the amount of prejudice defendants suffer against the public interest in avoiding confusion. *See id.* (citing *Conagra,* 743 F.2d at 1517).

There is a dispute as to the first element of laches—delay. ████████████████████████████████████████████ when Mr.

Ali contacted his local Republic broker and asked how ZCell obtained promotional jars of JOB papers when it was not an exclusive distributor. (Dkt. 219 at 17.)  Plaintiffs suggest the period began in May 2018, when a customer told Plaintiffs that Defendant ZCell was selling TOP® and JOB® products at unrealistic prices.  (Dkts. 222-1 ¶ 112; 222 at 18.) Plaintiffs filed this action on May 15, 2019.  (Dkt. 1.)   Even using Defendants' date as the starting point, Plaintiffs filed their complaint less than two and a half years after receiving notice of Defendants' counterfeiting activities—well within the four-year limitation period. There is thus a "strong presumption . . . that laches is inapplicable." *Angel Flight of Ga., Inc. v. Angel Flight SE, Inc.*, 424 F. Supp. 2d 1366, 1370 n.5 (N.D. Ga. 2006).  But because there is only a presumption, the Court addresses the other two elements—unexcusable delay and undue prejudice.

In determining whether delay is "excusable," a court must not "limit itself solely to a raw calculation of the time period . . . the court should also examine the *reasons* for any delay."  *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1345 (11th Cir. 1996) (Birch, J., concurring) (emphasis in original).  Plaintiffs contend that upon receipt

of the May 2018 customer alert, they promptly investigated the claim, conducted test buys, performed laboratory testing, and cooperated with DCPD's investigation and raid.  (Dkt. 222 at 18.)  While the delay from May 2018 through May 2019 may be deemed excusable, both parties fail to account for the time between January 2017 and May 2018.  There is no indication this seventeen-month delay was excusable.   Under the doctrine of progressive encroachment, "delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement."  *Kason*, 120 F.3d at 1206; *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.19 (4th ed. 1997) ("The senior user has no obligation to sue until the likelihood of confusion looms large. . . .") (quotations omitted).  Because there is no evidence of what occurred during the seventeen-month delay, the Court cannot determine when Plaintiffs knew or should have known they had a provable claim.  The Court agrees there is thus a genuine dispute as to whether Plaintiffs' delay was excusable.

Even if Defendants could show an inexcusable and unreasonable delay though, there is no evidence of undue prejudice.  *See Tim Hortons USA, Inc. v. Tims Milner LLC*, No. 18-cv-24152, 2019 WL 7376733, at *8

(S.D. Fla. Oct. 17, 2019) (finding the plaintiffs entitled to partial summary judgment as to liability in part because the defendants did not offer evidence to support their affirmative defense), *report and recommendation adopted*, 2020 WL 9549512 (S.D. Fla. Jan. 7, 2020); *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) ("[S]ummary judgment is appropriate where the defendant fails to come forward with evidence sufficient to dispute an element of the plaintiff's case or to support an affirmative defense.") (citing *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 804 F.2d 1577, 1580 (11th Cir. 1986) (affirming summary judgment for plaintiff), *reh'g granted and rev'd on other grounds*, 811 F.2d 565 (11th Cir. 1987)).

"Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Quest De La France*, 245 F.3d 1359, 1362 (Fed. Cir. 2001). ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████ [24] (Dkt. 219 at 18.) The Court, persuaded

by authority from the Third Circuit and Middle District of Florida, finds

a defendant's continued sale of infringing goods during a period of delay

does not constitute undue prejudice. *See Jenn-Air Corp. v. Penn*

*Ventilator Co.*, 464 F.2d 48, 49–50 (3d Cir. 1972) (holding no prejudice

occurred where "all that happened to [the defendant] was its continuance

of counterfeiting and selling its infringing products"); *Alfred Dunhill of*

*London, Inc. v. Kasser Distillers Prods. Corp.*, 350 F. Supp. 1341, 1368

(E.D. Pa. 1972) ("[T]he defendant has suffered no prejudice where

nothing more is shown than that it has continued to sell the infringing

product for the period in question."); *Ford Motor Co. v. O.E. Wheel*

*Distribs., LLC*, 868 F. Supp. 2d 1350, 1366 (M.D. Fla. 2012) ("[M]ere

expenditures in promoting, advertising, and/or selling an infringing

mark does not constitute undue prejudice for the purpose of laches.").

Defendant ZCell has thus failed to present a dispute of material fact

---

[24] Defendants cite no evidence for their assertion of undue prejudice.
They simply make the conclusory statement that ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

(Dkt. 219 at 18.) That is not enough.

regarding undue prejudice, and the Court grants Plaintiffs' motion for partial summary judgment as to Defendant ZCell.  Plaintiffs also only seek injunctive relief at the present time.  The existence of laches, if proven, would not prevent the issuance of injunctive relief to prevent further acts of trademark infringement.  Even in cases where laches bars a suit for damages due to inequity to the infringer, the Court may still grant injunctive relief to avoid "putting a judicial stamp of approval on conduct which will confuse customers."   6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.10 (4th ed. 1997).

### 2.   Defendant Lakhani's Personal Liability

Plaintiffs argue Defendant Lakhani is personally liable for the counterfeiting violations.  (Dkt. 194-1 at 21.)  Plaintiffs contend there is no dispute of material fact that Defendant Lakhani is individually liable because of his complete control over ZCell's actions in this case.  (*Id.* at 22.)  Defendants disagree.  They argue there is a dispute of material fact as to whether Defendant Lakhani knowingly or actively decided to engage in a counterfeiting scheme, thus precluding summary judgment against him.  (Dkt. 219 at 10.)

The Lanham Act provides for personal liability. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) ("Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act." (citing 15 U.S.C. §§ 1114, 1127; *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19 (5th Cir. 1968))). "If an individual actively and knowingly caused the infringement, he is personally liable." *Id.* "The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Id.* at 1478 n.8 (emphasis in original).

Plaintiffs argue Defendant Lakhani actively and knowingly caused the infringement because (1) he is the sole owner, officer, and CEO of Defendant ZCell; (2) he supervises ZCell's purchases, sales, accounts, banking, and negotiating, particularly when new suppliers are involved; and (3) he was responsible for negotiating and approving purchases from TN Vape. (Dkt. 200-1 ¶¶ 104–08.) Defendants do not dispute his active involvement in the business, including in the purchase of counterfeit

papers, but argue Defendant Lakhani is not personally liable because there is no direct evidence he had actual knowledge of counterfeiting. (Dkt. 219 at 11.)  Eleventh Circuit law, however, does not require specific knowledge of trademark infringement as a prerequisite to individual liability.  Instead, the law holds officers personally liable when they actively cause infringement as moving, conscious forces.  *See Top Tobacco, L.P. v. Panjwani*, Nos. 19-CV-2177 & 19-CV-2148, 2021 WL 1351443, at *4 (N.D. Ga. Mar. 15, 2021).

The Eleventh Circuit illuminated the issue in *Chanel*.  In that case, the famous designer and seller of luxury goods sued a company and two individuals who were selling handbags and belt buckles with counterfeit Chanel trademarks.  *Chanel*, 931 F.2d at 1476.  One individual was president and CEO of the defendant company.  *Id*.  The other individual was identified as a business associate.  *Id*.  The district court granted plaintiff summary judgment against all three defendants on treble damages and attorney's fees, necessarily finding "no genuine issue of fact regarding the knowledge and intent of [defendants]" to violate plaintiff's trademark.  *Id*.  The Eleventh Circuit reversed, finding a material dispute as to whether the individuals (and the company) knew their

actions violated plaintiff's trademark. *Id.* at 1477. Despite recognizing a material fact as to each individual's knowledge and intent, the Court of Appeals still found no genuine issue of material fact as to the president's personal liability. *Id.* at 1478. The Court explained evidence the president owned and operated the company, purchased the counterfeit goods from the supplier, advertised the good, and operated the showroom from which goods were sold was sufficient to establish his personal liability. *Id.* The *Chanel* court found this in the light of the fact that there was an issue of material fact as to whether the president knew the goods he sold were counterfeit. *Id.* In comparison, the Court of Appeals concluded the plaintiff presented insufficient evidence the business associate was personally liable as he had no ownership interest and was not connected to the purchase or sale of much counterfeit product. The Court of Appeals explained that evidence of his limited involvement in the business operation might allow a jury to conclude he actively caused the infringement (and thus is personally liable), but there existed a dispute of fact as to the extent of his involvement in the business. *Id.* As part of this, the court warned that merely selling goods does not make a person individually liable. Instead, the court explained, the issue is

whether the person "actively caused the infringement as a moving, conscious force."  931 F.2d at 1478 n.8.

When *Chanel* is read as a whole, it suggests knowledge, for purposes of personal liability, means knowledge of the infringing acts, not knowledge of infringement.  "This holding is consistent with other cases in which federal courts have held corporate officers personally liable despite their lack of specific knowledge or intent." *Panjwani*, 2021 WL 1351443, at *2 (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("The fact that an officer is acting for a corporation may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility."); *Loxottica Grp., S.p.A. v. Casa Los Martinez Corp.*, No. 1:14-cv-22859, 2015 WL 13776171, at *2 (S.D. Fla. Jan. 30, 2015) ("Whether the officer has knowledge that his acts will result in an infringement is immaterial to his individual liability."); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000) ("Where it is established that the officer is a 'moving, active, conscious force' behind the infringement, '[it] is immaterial whether . . . [he] knows that his acts will result in an infringement.' " (quoting *Bambu Sales, Inc. v. Sultana*

42

*Crackers, Inc.*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988))); *Polo Fashions, Inc. v. Branded Apparel Merch., Inc.*, 592 F. Supp. 648, 652–63 (D. Mass. 1984) (same)).   Some courts have emphasized strict liability applies "without regard to the veil that ordinarily separates officers from their corporations."   *Id.* (citing *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing the corporate veil."); *Donsco*, 587 F.2d at 606 ("This liability is distinct from the liability resulting from the 'piercing of the corporate veil' as that term is commonly used.")).   Defendant Lakhani thus may be held liable without regard to his knowledge of or willful blindness towards infringement as long as he actively caused the infringing acts as a moving, conscious force.

Defendant Lakhani is ZCell's CEO, sole owner, and only officer. (Dkts. 200-1 ¶ 6–7; 219-1 ¶ 6–7; 219-2 ¶ 2.)  He supervises all aspects of his company's purchases and sales.  (Dkts. 200-1 ¶ 104; 219-1 ¶ 104.) Defendant Lakhani oversees ZCell's approximately fifteen employees. (Dkts. 200-1 ¶ 105; 219-1 ¶ 105.)  He is personally involved in negotiating

pricing and bigger purchases.  (Dkts. 200-1 ¶ 106; 219-1 ¶ 106.)  When ZCell orders from a new supplier or a new product, Defendant Lakhani handles the initial negotiations.  (Dkts. 200-1 ¶ 107; 219-1 ¶ 107.)  He also decided what to order from TN Vape, instructed ZCell's manager, to place the orders, and gave approval for each order.  (Dkts. 200-1 ¶ 108; 219-1 ¶ 108.)  On this record, the Court finds Defendant Lakhani was chiefly responsible for buying and selling the counterfeit rolling papers and, therefore, "actively caused the infringement as a moving, conscious force."  *Chanel*, 931 F.2d at 1478 (holding an officer personally liable when the officer purchased counterfeit goods, advertised in local publications, and operated a showroom from which the goods were sold); *Panjwani*, 2021 WL 1351443, at *3 (holding a sole owner personally liable when he decided what the company bought and sold, selected the company's suppliers, and placed orders for the rolling papers); *Panjwani*, 2021 WL 1351443, at *3 (holding the sole incorporator, registered agent, CEO, CFO, and secretary personally liable when he decided what types of products the company sold, he was responsible for selecting and ordering products, only he interacted with suppliers, and he negotiated prices with suppliers).  The record evidence establishes that Defendant

Lakhani actively caused the infringement of Plaintiffs' products as a moving, conscious force.  Plaintiffs have shown the absence of any genuine issue of material fact in this regard.  The Court thus grants Plaintiffs' request for summary judgment on liability as to Defendant Lakhani.

### B.    Permanent Injunction

Plaintiffs also request a permanent injunction against Defendants to end their infringement of the TOP® and JOB® marks.  (Dkt. 194-1 at 7, 33.)  Pursuant to the Lanham Act, a district court is authorized to issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable," to prevent violations of trademark law.  15 U.S.C. § 1116(a).  Indeed, in "ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day."  *SunAmerica*, 77 F.3d at 1336; *see also Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) ("[I]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988))).  To obtain a permanent

injunction, Plaintiffs must show: (1) they suffered an irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

Plaintiffs assert, and the Court agrees, that they suffer irreparable harm by being unable to control the TOP® and JOB® marks. (Dkt. 194-1 at 34.)  "[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Irreparable harm can also be based upon the possibility of confusion." *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) ("[T]he lack of control over one's mark 'creates the *potential* for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.' ")).  The "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Id.* at 190–91; *see also Crossfit, Inc. v. Quinnie*, 232

F. Supp. 3d 1295, 1316 (N.D. Ga. 2017) ("Because the Court found that there is a sufficient showing of likelihood of confusion and that [the defendants'] use of KrossFit in connection to unrelated services dilutes the CROSSFIT® mark, the Court concludes that irreparable harm is established.").

"It is also generally recognized in trademark infringement cases that 'there is no adequate remedy at law to redress infringement.' " *Quinnie*, 232 F. Supp. 3d at 1316–17 (quoting *Tally-Ho*, 889 F.2d at 1029 (citation omitted)).  Defendants have no right to use the TOP® and JOB® marks, and "therefore could suffer no legitimate hardship by being forced to stop that which [they have] no right to do."  *Id.* at 1317 (quoting *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010)).  Plaintiffs, on the other hand, will suffer damages, such as the dilution of their marks, if Defendants are not enjoined.  Finally, the public interest would not be disserved because "the public deserves not to be led astray by the use of inevitably confusing marks." *Angel Flight Am.*, 522 F.3d at 1209.

Defendants contend Plaintiffs are not entitled to summary judgment on their request for injunctive relief because injunctive relief is

inappropriate when there is no evidence of continued counterfeiting. (Dkt. 219 at 18.)   For this argument, they cite *In re Circuit Breaker Litigation*, 860 F. Supp. 1453, 1456 (C.D. Cal. 1994), (Dkt. 219 at 18), from which they quote: "If . . . the defendant infringed innocently, ceased before judgment and *assured the court that it has no intention of infringing in the future*, the public needs no protection. In these circumstances, courts usually deny requests for permanent injunctions."[25]   *In re Circuit Breaker*, 860 F. Supp. at 1456.   The Court finds Defendants' argument unpersuasive.   First, Defendants have made no assurances to the Court that they have no intention of infringing in the future.   Second, Plaintiffs are not required to prove likely repetition of infringement to obtain an injunction.   *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) ("In this case, the district court refused to grant an injunction because the plaintiffs had not introduced any specific evidence to demonstrate that the defendants would infringe in the future. The court was correct in noting that cessation of unlawful conduct can moot such a dispute, but it failed to

---

[25] The Court notes Defendants misquoted *In re Circuit Breaker*, but their edits did not change the substance of the quote.  In any event, the Court directly quotes from *In re Circuit Breaker*.

recognize that the reform of the defendant must be irrefutably demonstrated and total." (internal quotation marks omitted)); *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp. 2d 449, 457 (E.D. Pa. 2001) ("A movant has no burden to prove likely repetition of the infringement to obtain an injunction."); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) ("[A]n injunction is unnecessary when 'there is *no* reasonable expectation that the wrong will be repeated.' " (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added))).  Third, Plaintiffs and consumers are entitled to legal assurances Defendants' counterfeiting will stop.  *See Habersham Plantation Co. v. Molyneux*, No. 10-CV-61526, 2012 WL 13005341, at *2 (S.D. Fla. May 8, 2012) ("The [d]efendants have asserted that they will not import and sell infringing products. Notwithstanding that assertion, [the plaintiff] is entitled to legal assurances that infringing sales will not continue.").  Fourth, if Defendants intend to stop selling counterfeit products, a permanent injunction will cause little to no hardship.  *See id.* ("In light of [the defendants'] professed agreement to stop sales, the hardship to [the defendant] by entry of a permanent injunction is small."); *Dick Bruhn*, 793 F.2d at 1135–36 ("If the defendants sincerely intend not to

infringe, the injunction harms them little; if they do, it gives [the plaintiff] substantial protection of its trademark."). A plaintiff in a trademark case "is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the [defendant], which has shown by its conduct that it is not to be trusted." *Dick Bruhn*, 793 F.2d at 1135 (quoting *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532 (1924)). Defendants are thus permanently enjoined from infringing the TOP® and JOB® marks.

## IV. Conclusion

The Court **GRANTS** Plaintiffs Motion for Partial Summary Judgment as to Liability. (Dkts. 185.)

The Court **GRANTS** Plaintiffs' request for a permanent injunction. (Dkt. 185 at 4.)

The Court **ORDERS** these parties to mediation for the remaining issues of willfulness, damages, and fees. The parties may retain the mediator. The expense of a retained mediator must be paid by the parties. The parties, alternatively, may request the Court to appoint a magistrate judge to conduct the mediation. The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before September 1, 2021, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before September 15, 2021. The parties must have present at the mediation a person with authority to settle this dispute.

The parties shall, within five (5) days after the mediation, notify the Court in writing whether mediation resulted in settlement.

**SO ORDERED** this 18th day of August, 2021.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE