# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Top Tobacco, L.P., et al.,

                    Plaintiffs,

                                     Case No. 1:19-cv-4939-MLB

v.

Star Importers & Wholesalers, Inc., et al.,

                    Defendants.

_____/

Star Importers & Wholesalers, Inc. & Amin S. Hudda,

                    Counterclaim
                    Plaintiffs,

v.

Top Tobacco, L.P., et al.,

                    Counterclaim
                    Defendants.

_____/

## <u>OPINION & ORDER</u>

Plaintiffs Top Tobacco, L.P. ("Top"), Republic Technologies (NA),

LLC ("Republic Technologies"), and Republic Tobacco, L.P. ("Republic")

are the owners and exclusive sellers in the United States of cigarette rolling papers sold and distributed under the trademarks TOP® and JOB®.   They sued Defendants Star Importers & Wholesalers, Inc. ("Star") and Amin S. Hudda, asserting federal and state claims arising from Defendants' alleged sale of cigarette rolling papers that contained counterfeit trademarks.   Plaintiffs move for summary judgment as to liability on all their claims, leaving the issues of willfulness, exceptionality, damages, and fees for trial.  (Dkt. 186/195.)[1]  The Court grants in part and denies in part that motion and grants Plaintiffs' request for a permanent injunction.

## I.    Background

The Court draws the facts largely from the parties' submissions.  In support of their motion for summary judgment, Plaintiffs filed a statement of material facts (Dkt. 195-2).  *See* LR 56.1(B)(1), NDGa. Defendants responded to it and filed a separate statement of additional

---

[1] For the rest of this opinion, if the parties filed both a redacted and an unredacted version of a document, the Court cites to the unredacted version.  The Court notes the parties did not file both versions for all documents.  The page numbers on certain deposition transcripts do not match the page numbers applied by the CM/ECF system.  The Court cites the CM/ECF page numbers for all docket entries.

facts.  (Dkts. 211-2; 211-1.)   *See* LR 56.1(B)(2)(a) and 56.1(B)(2)(b).
Plaintiffs responded to that.  (Dkt. 224.)  *See* LR 56.1(B)(3).

The Court uses the parties' proposed facts and responses as follows:
When a party does not dispute the other's fact, the Court accepts it for
purposes of summary judgment and cites the proposed fact and
corresponding response.  When one side admits a proposed fact in part,
the Court includes the undisputed part.  When one side denies the other's
proposed fact in whole or in part, the Court reviews the record and
determines whether a factual dispute exists.  If the denial is without
merit, the Court deems the fact admitted so long as the record citation
supports it.  If a fact is immaterial, it is excluded.[2]  If a fact is stated as
an issue or legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where
appropriate, the Court modifies one party's fact per the other's response
when the latter better reflects the record.  Finally, as needed, the Court

---

[2] Some proposed facts the Court declines to exclude on materiality
grounds are not "material" as that term is generally employed in the
summary judgment context.  *See Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986) (identifying material facts as those that "might
affect the outcome of the suit under the governing law").  Some are
included for background purposes or to generate context for the Court's
analysis.  Which facts ultimately prove material should be apparent from
the analysis.

draws some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## A.   Experts

To recover on their trademark infringement claims, Plaintiffs must show Defendants made unauthorized use of Plaintiffs' marks in a manner likely to cause consumer confusion. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300–01 (11th Cir. 2001). To meet their burden, Plaintiffs partially rely on expert declarations from Marine Teisseyre and Virginie Rosarde (Republic employees) stating they tested certain cigarette papers containing TOP® and JOB® trademarks obtained from Defendants and determined they are counterfeit papers. (Dkts. 195-7; 195-8; 195-9; 195-10.) Defendants object to this testimony, arguing Plaintiffs failed to disclose Ms. Rosarde and Ms. Teisseyre as experts and they have not been admitted as experts. (Dkt. 211-2 ¶¶ 116–17, 126–31, 140–45, 149–52, 158–60, 171, 173–78, 180–81, 186, 197.) For every objection, Defendants repeat some variation of: "Rosarde was not disclosed as an expert and has not been admitted as an expert" or

"[Teisseyre] was not disclosed as an expert and has not been admitted as an expert." (*Id.*)

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). Any such disclosure must also "be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). If a party fails to identify a witness as required by Rule 26(a), the party is not allowed to use that information or witness at trial, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

"As the moving party, Defendant[s] [have] the initial burden of showing a valid basis to strike Plaintiff[s'] expert witness disclosures." *Reid v. United States*, No. 3:14-cv-420, 2015 WL 12857077, at *3 (M.D. Fla. July 2, 2015); *see also Commodores Entm't Co. v. McClary*, No. 6:14-cv-1335, 2016 WL 7381697, at *2 (M.D. Fla. Jan. 22, 2016) (moving party bears initial burden of showing valid basis to strike opposing party's expert witness disclosures). Defendants have not shown a valid basis to

strike Plaintiffs' expert witness disclosures.  First, Defendants object to Ms. Rosarde's and Ms. Teisseyre's testimony in their response to Plaintiffs' statement of material facts without citing any evidence.  They have not moved to exclude their testimony.  Second, Defendants' objections are merely conclusory statements with no factual bases. Third, Ms. Rosarde and Ms. Teisseyre were listed in Plaintiffs' initial disclosures and Plaintiffs' counsel stated there were expert disclosures by some lab technicians during Plaintiffs' 30(b)(6) representative's deposition (which was taken on October 1, 2020, before the close of discovery).  (Dkts. 210-1 at 16–17; 190-1 at 273:24–25.)  The Court thus overrules Defendants' objection and considers Ms. Rosarde's and Ms. Teisseyre's testimony.[3]  If Defendants believe Plaintiffs have violated Rule 26, they may file appropriate motions in advance of trial.

---

[3] Even excluding Ms. Rosarde's and Ms. Teisseyre's testimony, there is other undisputed evidence Defendants sold counterfeit products.  This includes a declaration by Tamas Malacsina (Plaintiffs' Vice President of Marketing) averring that he examined TOP- and JOB-brand papers purchased from Star and concluded they were counterfeit.  (Dkt. 190-1 at 503–04.)  Ms. Rosarde and Ms. Teisseyre later determined some of those papers were genuine.  (Dkt. 211-1 ¶ 45.)  They did not conclude he was wrong as to all the papers he identified as counterfeit

## B.    Authentication

Plaintiffs object to multiple statements of fact asserted by Defendants on the grounds Defendants rely on documents for which no foundation has been established.  (Dkt. 224 ¶¶ 90–91, 93.)  Plaintiffs specifically object to Defendants' reliance on an email chain between Joe Sierra (Plaintiff Republic's Regional Zone Manager for the Southeast), Philip Patton (one of Plaintiff Republic's Regional Sales Managers), and others; text messages between Third-Party Defendant Alex Seriana (the owner of Third-Party Defendant TN Vape) and Mr. Patton; and an email chain between Plaintiffs' counsel and Defendants' counsel.

"Generally, documents must be properly authenticated in order for them to be considered on summary judgment." *APA Excelsior III, L.P. v. Windle*y, 329 F. Supp. 2d 1328, 1335 (N.D. Ga. 2004).  Under Federal Rule of Evidence 901, a document is authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  "To meet this standard, the proponent need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be." *APA Excelsior III*, 329 F. Supp. 2d at 1335 (quoting *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993)).  On

summary judgment, "courts may look to other evidence in the case to determine whether a challenged document meets the standard of Rule 901." *Id.*; *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1159 (W.D. Wash. 2006) (court may "conduct an independent analysis and admit into evidence certain documents containing 'a prima facie aura of reliability,' even where they are not properly authenticated"). "Although section 901(b) illustrates various methods of authentication, these methods are not intended to be the only methods of authentication." *Bury v. Marietta Dodge*, 692 F.2d 1335, 1338 (11th Cir. 1982). Finally, even if the documents are not properly authenticated on summary judgment, courts will consider certain documents if, "given the nature of the challenged documents, . . . they could easily be authenticated and rendered admissible at trial." *See Burger King Corp. v. Lumbermens Mut. Cas. Co.*, 410 F. Supp. 2d 1249, 1255 (S.D. Fla. 2005); *see also U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F. Supp. 2d 1322, 1327 n.2 (S.D. Ala. 2003) ("Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial."); *Cooper v. Southern Co.*, 213 F.R.D. 683,

686 (N.D. Ga. 2003) ("[T]here is no requirement that evidence be presented in admissible form at summary judgment as long as the evidence would be admissible at trial.").

All three exhibits are capable of being authenticated at trial, and the Court thus considers them. *See Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("[A] court may only consider evidence that is admissible or that could be presented in an admissible form."); *see also The Lamar Co., L.L.C. v. City of Marietta*, 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008) ("The court notes that it may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial.").

### C.   Plaintiffs' Business, Trademarks, and Products

Plaintiff Top owns the trademarks TOP®, ®, ®, and ® for use in connection with cigarette rolling papers and related goods.  (Dkts. 195-2 ¶ 1; 211-2 ¶ 1.)  Plaintiff Republic Technologies owns the trademarks JOB®, ®, ®,

9

®, and ® for use in connection with cigarette rolling papers and related goods.  (Dkts. 195-2 ¶ 2; 211-2 ¶ 2.)

Top owns and maintains several federal trademark registrations for the TOP® marks, including, among others, U.S. Registration Nos. 2739465, 2831105, 3677986, and 3677987 for cigarette papers, U.S. Registration Nos. 2293958 and 2739466 for smoking tobacco, U.S. Registration Nos. 3407400 and 3720176 for cigarette making machines, U.S. Registration No. 3710606 for tobacco, and U.S. Registration No. 3918139 for pocket machines for rolling cigarettes for personal use. (Dkts. 195-2 ¶ 18; 211-2 ¶ 18.)  Republic Technologies owns many federal trademark registrations for the JOB® marks including, among others, U.S. Registration Nos. 73124, 1341384, 1357088, 3834324, 4019091, and 4019093 for cigarette papers.  (Dkts. 195-2 ¶ 21; 211-2 ¶ 21.)

For many years, Plaintiffs and their predecessors sold and distributed cigarette papers and related items.  (Dkts. 195-2 ¶ 8; 211-2 ¶ 8.)  Plaintiff Top and its predecessors have continuously used the TOP® trademark to sell cigarette papers in the United States since at least 1942.  (Dkts. 195-2 ¶ 12; 211-2 ¶ 12.)  Republic Technologies and its

predecessors have used the JOB® mark continuously for over 150 years in connection with the sale of cigarette papers. (Dkts. 195-2 ¶ 13; 211-2 ¶ 13.)  The TOP® and JOB® brands are well-known brands and even considered famous by some. (Dkts. 191-1 at 33:1–5; 180-1 at 110.)

TOP® and JOB® cigarette rolling papers are manufactured exclusively in Perpignan, France. (Dkts. 195-2 ¶¶ 24–25; 211-2 ¶¶ 24–25.)  Plaintiffs' laboratory in France thus knows the exact composition of genuine TOP® and JOB® papers and can identify counterfeit papers. (Dkts. 195-2 ¶ 26; 211-2 ¶ 26.)  Republic is the sole distributor authorized to purchase TOP® and JOB® brand items from the manufacturing facilities. (Dkts. 195-2 ¶ 27; 211-2 ¶ 27.)  Republic is also the exclusive United States licensee of the TOP® and JOB® marks in the United States. (Dkts. 195-2 ¶ 28; 211-2 ¶ 28.)  Likewise, Plaintiff Republic is the exclusive distributor in the United States of TOP- and JOB-brand cigarette rolling papers. (Dkts. 195-2 ¶ 3; 211-2 ¶ 3.)  TOP® and JOB® products are manufactured for Republic and sold in the United States through Republic. (Dkts. 195-2 ¶ 4; 211-2 ¶ 4.)[4]

---

[4] Defendants dispute Plaintiffs' factual assertion to the extent it implies the TOP- and JOB-brand cigarette papers must be purchased directly from Republic. (Dkt. 211-2 ¶ 3.)  But Plaintiffs' fact does not allege that.

Plaintiffs, under the TOP® brand, sell various cigarette papers in different sizes and volumes.  (Dkts. 195-2 ¶ 31; 211-2 ¶ 31.)  While Plaintiffs have provided undisputed evidence about those configurations, the details are not relevant to summary judgment.  The TOP® product packaging prominently displays the TOP marks in multiple locations, including on all sides of the carton, on the top and bottom of individual booklets, and on the inner flap of each booklet.  (Dkts. 195-2 ¶ 34; 211-2 ¶ 34.)

Plaintiffs, under the JOB® brand, sell various cigarette papers, including JOB® Gold, JOB® Orange, and Job® French White.  (Dkts. 195-2 ¶¶ 36–37; 211-2 ¶¶ 36–37.)  They do this in various packaging configurations and sizes, but (again) those details are not relevant here. The JOB® product packaging prominently displays the JOB® marks in multiple locations, including on all sides of the carton, on the top and bottom of individual booklets, on the inner flap of each booklet, and embossed on the leaves themselves.  (Dkts. 195-2 ¶ 47; 211-2 ¶ 47.)

Plaintiffs sell their TOP® and JOB® products in the United States to wholesalers and retailers.  (Dkts. 195-2 ¶ 29; 211-2 ¶ 29.) ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████  (Dkts. 195-2 ¶ 30;

211-2 ¶ 30.)  Plaintiffs sell the products at issue to several customers in

the Atlanta area.  (Dkts. 195-2 ¶ 16; 211-2 ¶ 16.)  Plaintiffs consider the

goodwill and consumer recognition associated with their TOP and JOB

marks to be one of their most valuable assets.  (Dkts. 195-2 ¶ 17; 211-2

¶ 17.)

**D.    Defendants' Business and Relationship with Plaintiffs**

Star is a Georgia corporation with its primary place of business in

Tucker, Georgia.  (Dkts. 195-2 ¶ 5; 211-2 ¶ 5.)  It is a general merchandise

wholesaler, selling lots of different things to wholesalers, retailers, gas

stations, and supermarkets.[5]  (Dkts. 195-2 ¶ 60; 211-2 ¶ 60.)  Star is one

of the largest wholesalers of its type in the Southeast, selling about

14,000 items.   (Dkts. 195-2 ¶ 61; 211-2 ¶ 61; 211-1 ¶ 4; 224 ¶ 4.)

---

[5] Plaintiffs object to certain facts in Defendants' statement of facts as not in compliance with the Local Rules because they are alternative facts, rather than additional facts.  (*See, e.g.*, Dkt. 224 ¶ 1.)  The Court agrees. The Local Rules permit a respondent to submit "[a] statement of *additional* facts which the respondent contends are material and present a genuine issue for trial."  LR 56.1(B)(2)(b) (emphasis added).  Where appropriate, however, the Court uses one party's fact when it is stated better.

Defendant Hudda is Star's president and owner. (Dkts. 195-2 ¶ 6; 211-2 ¶ 6.)

Star sells tobacco products, including cigarette papers bearing TOP® and JOB® marks. (Dkts. 195-2 ¶ 66; 211-2 ¶ 66; 188-1 at 68:13–16.) Star was a direct customer of Republic for nearly 20 years and an exclusive customer for several years. (Dkts. 195-2 ¶¶ 70-71; 211-2 ¶¶ 70-71.) While an exclusive direct-buying customer, Star could not carry brands that competed with Plaintiffs' brands. (Dkts. 195-2 ¶ 73; 211-2 ¶ 73.) During that time, Star was enrolled in Plaintiffs' Value-Added Rebate Incentive Program ("VRIP"). (Dkts. 195-2 ¶ 72; 211-2 ¶ 72.) Star received certain rebates and incentives, including trips, based on sales volume. (Dkts. 195-2 ¶ 74; 211-2 ¶ 74.) Star earned several incentive trips with Republic. (Dkts. 195-2 ¶ 75; 211-2 ¶ 75.) Defendant Hudda got to know other Republic buyers through these trips. (Dkts. 195-2 ¶ 77; 211-2 ¶ 77.)

In 2016, Defendants terminated Star's exclusive relationship with Plaintiffs so it could carry other cigarette paper brands. (Dkts. 195-2 ¶ 78; 211-2 ¶ 78; 211-1 ¶ 7; 224 ¶ 7.) Defendant Hudda made that decision. (Dkts. 188-1 at 29:12–16, 103:23–24; 195-2 ¶ 98; 211-2 ¶ 98.)

Starr continued purchasing TOP® and JOB® papers from Plaintiffs as a non-exclusive direct-buying customer. (Dkts. 195-2 ¶ 78; 211-2 ¶ 78; 211-1 ¶ 7; 224 ¶ 7.) In February 2019, Star enrolled in Plaintiffs' travel program and remained eligible for incentive trips based on its purchases from Plaintiffs. (Dkts. 211-1 ¶ 11; 224 ¶ 11.) As a non-exclusive direct buyer, it also received certain discounts. (Dkts. 211-1 ¶ 12; 224 ¶ 12.)

In the period from January 2012 to May 2019, Star purchased nearly $3.5 million worth of TOP® and JOB® cigarette papers from Republic. (Dkts. 195-2 ¶ 80; 211-2 ¶ 80.) Star typically sold through most of its TOP® and JOB® inventory within two weeks. (Dkts. 195-2 ¶ 81; 211-2 ¶ 81; 211-1 ¶ 15; 224 ¶ 15.) Customers would ask Star for promotional "jars" of JOB® papers that only exclusive customers could buy from Plaintiff Republic. (Dkts. 195-2 ¶ 82; 211-2 ¶ 82.) Star testified that the ability to purchase those exclusive promotional products was one of the main benefits of being an exclusive Republic customer, although Defendant Hudda was unaware of that benefit until he terminated his exclusive arrangement with Plaintiffs. (Dkts. 195-2 ¶ 83; 211-2 ¶ 83; 188-1 at 109:5–12; 211-1 ¶ 74; 224 ¶ 74.)

15

██████████████████████████████████

██████████████████████████████████

████████████████████████████ (Dkts. 195-2

¶ 90; 211-2 ¶ 90; 211-1 ¶ 20; 224 ¶ 20.)[6]   TN Vape is owned by Third-

Party Defendant Alex Seriana.   Paul Hinton, Republic's broker, knew

Star was purchasing products from sources other than Republic.   (Dkts.

211-1 ¶ 34; 224 ¶ 34; 193-1 at 33:10–16.)   As of 2018, Mr. Patton,

Republic's Regional Sales Manager, was also in contact with Mr. Seriana

via text and purchased product from him.[7]   (Dkts. 211-1 ¶ 91, at 42–52;

224 ¶ 91.)

---

[6] ███████████████████████████████████████████████████ It became
one later.  (Dkts. 195-2 ¶ 92; 211-2 ¶ 92; 224 ¶ 95; 190-1 at 84:24–85:9.)
TN Vape has never been an exclusive customer of Republic.  (Dkts. 195-
2 ¶ 93; 211-2 ¶ 93.)

[7] Plaintiffs object to this fact as inadmissible hearsay.  (Dkt. 224 ¶ 91.)
While courts cannot rely on inadmissible hearsay to decide a motion for
summary judgment, courts can rely on evidence that can be "reduced to
admissible evidence at trial or reduced to admissible form." *Macuba v.
Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999) (quotations omitted).
"The most obvious way to reduce hearsay to admissible form is to call the
declarant to testify at trial." *Lewis v. Residential Mortg. Sols.*, 800 F.
App'x 830, 834 (11th Cir. 2020).  The Court sees no reason why Mr.
Patton or Mr. Seriana could not lay a foundation for these text messages.

As its president and owner, Defendant Hudda oversees Star's employees and operations and makes some business decisions. (Dkt. 188-1 at 27:10–25; 28:1–3.) He tries to get involved in big negotiations. (*Id.* at 93:24–94:1.) And "most of the time," he decides which products to carry. (*Id.* at 28:21–29:4, 103:5–8.) Based on his roughly 20 years of experience as a direct Republic customer, Defendant Hudda is familiar with genuine TOP® and JOB® products and their packaging and can recognize the Republic logos and trademarks. (Dkts. 195-2 ¶ 97; 211-2 ¶ 97.) He has also turned over possibly counterfeit product to a supplier for investigation. (Dkts. 211-1 ¶ 104; 224 ¶ 104; 188-1 at 252:10–17.)

The Star warehouse is 110,000 square feet, including a 50,000 square foot showroom. (Dkts. 195-2 ¶ 64; 211-2 ¶ 64.) Mr. Hinton visited the warehouse once a week without giving notice. (Dkts. 211-1 ¶ 32; 224 ¶ 32; 193-1 at 36:25–37:3, 40:9–13.) No one ever told him certain areas were off limits or prevented him from inspecting any product. (Dkts. 211-1 ¶ 33; 224 ¶ 33; 193-1 at 39:17–40:7.) Mr. Hinton never saw any products he thought were counterfeit. But he was not trained at the time to identify such product. (Dkts. 211-1 ¶¶ 36, 84; 224 ¶¶ 36, 84; 193-1 at 43:6–22.) Mr. Sierra, Plaintiffs' Regional Zone Manager for the

Southeast, also testified he never saw any products that looked suspicious or counterfeit when he was at the Star warehouse. But he also had no training about how to recognize counterfeit items. (Dkts. 211-1 ¶ 38; 224 ¶ 38; 189-1 at 45:24–46:2, 51:9–12.)

### E. Defendants' Sales of Allegedly Counterfeit Products

Plaintiffs often discovered counterfeit cigarette papers bearing the TOP® and JOB® marks being sold in the same channels as authentic TOP® and JOB® products. (Dkts. 195-2 ¶ 51; 211-2 ¶ 51.) Manufacturers of counterfeit cigarette papers have become adept at copying Plaintiffs' TOP® and JOB® marks and product packaging. (Dkts. 195-2 ¶ 54; 211-2 ¶ 54.) Plaintiffs thus maintain an anti-counterfeiting program.[8] (Dkts. 195-2 ¶ 55; 211-2 ¶ 55.) As part of this, Plaintiffs use private investigators to investigate tips of counterfeit merchandise, coordinate with law enforcement to seize that merchandise, and publicize their efforts. (Dkts. 195-2 ¶¶ 56–58; 211-2 ¶¶ 56–58.)

---

[8] Defendants dispute that Plaintiffs' anti-counterfeiting program is adequate to protect against violations and infringements of the TOP® and JOB® marks. (Dkt. 211-2 ¶ 55.) To the extent the fact has such implication, the Court draws all inferences in Defendants' favor.

18

Plaintiffs also file lawsuits around the country to protect their trademarks. (Dkts. 195-2 ¶ 59; 211-2 ¶ 59.)

Star has offered and sold counterfeit products bearing the TOP® and JOB® marks. (Dkts. 195-2 ¶ 102; 211-2 ¶ 102.) In January 2019, Plaintiffs received a tip that Star was potentially selling counterfeit TOP® and JOB® products.[9] (Dkts. 195-2 ¶ 103; 211-2 ¶ 103.) Over the next several months, Victor Hartman, one of Plaintiffs' investigators, supervised three undercover purchases of TOP® and/or JOB® cigarette papers at the Star warehouse by a confidential source. (Dkts. 195-2 ¶¶ 104–138; 211-2 ¶¶ 104–138.) In each instance, Mr. Hartman completed a chain of custody form and shipped samples of the items purchased to France for testing.[10] (Dkts. 195-2 ¶¶ 111, 125, 139; 211-2

---

[9] Defendants deny the tip was meritorious. (Dkt. 211-2 ¶ 103.) To the extent the fact has any such implication, the Court draws all inferences in Defendants' favor. Defendants also assert that before the 2019 tip, Plaintiffs' agents received other tips that Star was a source of counterfeit goods in the marketplace. (Dkts. 211-1 ¶ 39; 224 ¶ 39; 193-1 at 145; 189-1 at 195.) Defendants also contend that, as of February 2018, Plaintiffs were aware of counterfeit items being sold by a "jobber" in the Nashville/Knoxville area. (Dkts. 211-1 ¶ 90, at 39–40; 224 ¶ 90.)

[10] At Plaintiffs' laboratory, the process used by Plaintiffs' trained technicians to determine whether a product is counterfeit is methodical, standardized, and in accordance with best practices. (Dkts. 195-2 ¶ 112; 211-2 ¶ 112.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

¶¶ 111, 125, 139.)  And, in each instance, ███████████████████████

███████████████████████ (Dkts. 195-2 ¶¶ 116, 136, 128, 130, 140,

142, 144; 211-2 ¶¶ 116, 136, 128, 130, 140, 142, 144.)  Likewise, in each

instance, ████████████████████████████████████████

██████████ (Dkts. 195-2 ¶¶ 117, 127, 129, 131, 141, 143, 145; 211-2

¶¶ 117, 127, 129, 131, 141, 143, 145.)  Some of the booklets purchased

from Star by Plaintiffs' confidential source tested genuine.  (Dkts. 211-2

¶¶ 116, 126, 128, 130, 158–60; 211-1 ¶ 44; 190-1 at 479, 485, 499–500,

509; 190-2 at 80.)

In April 2019, Plaintiffs coordinated with one of their customers to

buy even larger quantities of TOP® and JOB® papers from Star.  (Dkts.

195-2 ¶ 146; 211-2 ¶ 146.)  Plaintiffs' counsel sent the samples to France



(Dkts. 195-2 ¶ 113; 211-2 ¶ 113.)

(Dkts. 195-2 ¶ 114; 211-2 ¶ 114.)

(Dkts. 195-2 ¶ 115; 211-2 ¶ 115.)

for testing.  (Dkts. 195-2 ¶ 148; 211-2 ¶ 148.) ████████████████

████████████████████████████████████████████████

████████████   (Dkts. 195-2 ¶¶ 149–52; 211-2 ¶¶ 149–52.)

In April 2019, Plaintiffs began working with the DeKalb County Police Department to obtain a criminal search warrant for Star's warehouse.  (Dkts. 195-2 ¶ 154; 211-2 ¶ 154.)  As part of this, one of Plaintiffs' investigators worked with police to purchase TOP® and JOB® products from Star on May 7, 2019.  (Dkts. 195-2 ¶ 155; 211-2 ¶ 155.) ████

████████████████████████████████████████████████

████████████   (Dkts. 195-2 ¶¶ 158–60; 211-2 ¶¶ 158–60.)

On May 14, 2019, police (with Plaintiffs' investigator) executed the search warrant.  (Dkts. 195-2 ¶ 162; 211-2 ¶ 162.)  Sachin Lele, Plaintiffs' General Counsel, and Mr. Malacsina, its Vice President of Marketing, were present to identify Plaintiffs' products and/or potential counterfeit products.   (Dkts. 195-2 ¶ 163; 211-2 ¶ 163.)   Police seized many products.[11] (Dkts. 195-2 ¶ 164; 211-2 ¶ 164.)  They labeled each item with the location and product.  (Dkts. 195-2 ¶ 167; 211-2 ¶ 167.)  Plaintiffs'

---

[11] The parties argue about the exact products seized, including as to whether Star ever purchased so-called "100-count TOP jars."  (Dkts. 195-2 ¶¶ 164, 172; 211-2 ¶¶ 164, 172.)  This disagreement is immaterial.

investigator then sent samples to France for testing. (Dkts. 195-2 ¶¶ 168–69; 211-2 ¶¶ 168–69.) ███████████████████████████ ███████████████████████████ (Dkts. 195-2 ¶¶ 171–78; 211-2 ¶¶ 171–78.)

The allegedly counterfeit products from the four undercover purchases and the seizure *appeared* to be genuine. (Dkts. 195-2 ¶ 179; 211-2 ¶ 179.) Defendants testified that the TOP- and JOB-brand products obtained from Star and confirmed to be counterfeit were likely purchased from TN Vape and Birmingham Wholesale. (Dkts. 195-2 ¶ 94; 211-2 ¶ 94.) Indeed, within a month of being served with this lawsuit, Defendants provided information to Plaintiffs showing Defendants purchased the products at issue from Birmingham Wholesale and TN Vape. (Dkts. 211-1 ¶¶ 93, 61–63; 224 ¶ 93.) After the raid, Star also returned remaining products it had purchased from Birmingham Wholesale. (Dkts. 211-1 ¶ 58; 224 ¶ 58; 188-6 at 11.)

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████[12]  (Dkts. 195-2 ¶ 95; 211-2 ¶ 95.)

## F.     Harm and Confusion

The counterfeit cigarette papers bearing the TOP® and JOB® marks sold by Defendants are of lesser quality than Plaintiffs' genuine papers.  (Dkts. 195-2 ¶ 181; 211-2 ¶ 181.)  Top is a long-time signatory in good standing of the Master Settlement Agreement between the Attorneys General of the numerous settling states and participating manufacturers of tobacco products.  (Dkts. 195-2 ¶ 182; 211-2 ¶ 182.) Republic abides by the market restrictions of that agreement.  (*Id.*) Plaintiffs have taken steps to ensure their products comply with applicable laws and regulations regarding the marketing and manufacturing of smokers' articles.  (Dkts. 195-2 ¶ 183; 211-2 ¶ 183.) Plaintiffs have submitted all their products to and registered their

---

[12] The parties dispute the exact number of each jar sold.  (Dkts. 195-2 ¶ 95; 211-2 ¶ 95.)  That is immaterial, at least for now.  The figures discussed may also include genuine products sold and do not account for Defendant Star's profit margin.  (Dkts. 211-1 ¶¶ 98–101; 224 ¶¶ 98–101.) Again, not currently material.

ingredients with the FDA pursuant to the Family Smoking Prevention and Tobacco Control Act.  (Dkts. 195-2 ¶ 184; 211-2 ¶ 184.)

The counterfeit papers contain unknown and unapproved components (like glues and additives) that may be harmful to consumers. (Dkts. 195-2 ¶ 186; 211-2 ¶ 186.)  Any association between Plaintiffs' trademarks and Defendants' counterfeit products undermines the goodwill and standing of Plaintiffs and their products to the public and regulators.  (Dkts. 195-2 ¶ 187; 211-2 ¶ 187.)

When Plaintiffs can obtain papers subject to a customer complaint, Plaintiffs test them to see if they are counterfeit.  (Dkts. 195-2 ¶ 189; 211-2 ¶ 189.)  Because the product packaging of counterfeit goods so closely mimics the genuine product packaging and TOP® and JOB® marks associated with Plaintiffs' genuine products, consumers who purchase these substandard products believe they are authentic and attribute the defects and inferior quality to Plaintiffs—not to Defendants or the unauthorized manufacturer trafficking in such goods.[13]  (Dkts. 195-2 ¶ 190; 211-2 ¶ 190.)  Such reputational harms are incalculable.

---

[13] To the extent this fact implies the allegedly counterfeit products did not appear genuine to Defendants, the Court draws all inferences in Defendants' favor.  (Dkt. 211-2 ¶ 190.)

(*Id.*)  Based on the chemical, visual, and physical differences between authentic TOP® and JOB® papers and the samples obtained in the undercover purchases and seizure, Republic Technologies' technicians were able to confirm some of those samples are counterfeit.  (Dkts. 195-2 ¶ 197; 211-2 ¶ 197.)

## G.   The Lawsuit

Plaintiffs sued Defendants for their involvement in the purchase, sale, and distribution of counterfeit papers.  (Dkt. 88.)  They asserted claims under the Lanham Act, 15 U.S.C. § 1051 et seq., for trafficking in counterfeit goods, federal trademark infringement, and unfair competition and false design origin.  They also asserted claims for Georgia statutory unfair competition under O.C.G.A. §§ 23-2-55 et seq; deceptive trade practices under O.C.G.A. §§ 10-1-372 et seq.; common law trademark infringement; common law unfair competition; and common law unjust enrichment.  (*Id.* at 23–40.)  Plaintiffs also requested entry of a permanent injunction against Defendants.  (*Id.* at 41–42.)

Plaintiffs move for partial summary judgment as to liability, arguing a trial is necessary only to determine willfulness, exceptionality, damages, and fees.  (Dkt. 186.)  Defendants responded, arguing material

disputed facts exist as to (1) likelihood of confusion, (2) whether Plaintiffs'
claims are barred by acquiescence, laches, and unclean hands;
(3) Defendant Hudda's individual liability; and (4) the need for a
permanent injunction.  (Dkt. 204.)

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court
"shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if
it "might affect the outcome of the suit under the governing law." *W. Grp.
Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing
*Anderson*, 477 U.S. at 248).  A factual dispute is genuine "if the evidence
is such that a reasonable jury could return a verdict for the nonmoving
party." *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden
of showing a court, by reference to materials in the record, that there is
no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm
Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  The nonmoving party then has
the burden of showing that summary judgment is improper by coming

forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

Throughout its analysis, the Court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc)).  "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

27

## III.   Discussion

### A.   Infringement

Claims for federal counterfeiting and trademark infringement, 15 U.S.C. § 1151, and for unfair competition and false designation of origin (based upon trademark violation), 15 U.S.C. § 1125(a)(1), have the same elements.  *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 n.14 (11th Cir. 1989); s*ee also Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) ("We, like other circuits, often blur the lines between [Lanham Act infringement] claims and [Lanham Act false designation of origin] claims because recovery under both generally turns on the confusion analysis.").  To prove either form of a Lanham Act violation, Plaintiffs must show: (1) they own valid marks entitled to protection, (2) Defendants used Plaintiffs' marks in commerce, and (3) Defendants' marks are likely to cause consumer confusion.  *Davidoff & CIE, S.A.*, 263 F.3d at 1301.  The same elements govern Plaintiffs' claims for violations of Georgia's Unfair Competition Statute, Georgia's Uniform Deceptive Trade Practices Act, and common law trademark infringement and unfair competition.  *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 n.11 (11th

Cir. 2007) ("[T]he analysis of a Georgia unfair competition claim is 'co-extensive' with the analysis of a Lanham Act claim."); *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997) ("It should be apparent that § 43(a) of the Lanham Act and § 10-1-372(a)(2) of the UDTPA provide analogous causes of action governed by the same standard."); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985) ("[T]he standards governing most of the claims under Georgia law are similar, if not identical, to those under the Lanham Act.").

### 1.    Defendant Star's Liability

Plaintiffs have produced evidence showing they own protectable trademarks in JOB® and TOP®, and Defendants do not challenge that assertion.  (Dkts. 195-2 ¶¶ 18, 21; 211-2 ¶¶ 18, 21.)  Plaintiffs have also produced evidence Defendants used their marks in commerce.  (Dkts. 195-2 ¶¶ 102, 104–11, 116–17, 124–31, 138–45, 147–52, 156, 158–60; 211-2 ¶¶ 102, 104–11, 116–17, 124–31, 138–45, 147–52, 156, 158–60.) Defendants do not challenge that either.[14]  (*See generally* Dkt. 204.)  The

---

[14] "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on

parties thus agree no genuine issue of material fact exists as to the first two elements. Only the third—likelihood of consumer confusion—is at issue. While Defendants admit the counterfeit products appeared genuine, they argue Plaintiffs' declarations alleging likelihood of confusion contain generalized and conclusory statements and that the evidence contains disputed facts about their intent. (Dkts. 195-2 ¶ 179; 211-2 ¶ 179; 204 at 18.)

In a typical trademark infringement case, the Eleventh Circuit applies a seven-factor balancing test to assess whether a likelihood of confusion exists. *See Tana v. Dantanna's*, 611 F.3d 767, 774–75 (11th Cir. 2010). The Eleventh Circuit test evaluates: (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base;

---

summary judgment." *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* (citing *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).

(5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's goodwill; and (7) the existence and extent of actual confusion in the consuming public. *Id.* "In applying this test, no single factor is dispositive, but greater weight is given to the type of mark and evidence of actual confusion." *Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1377 (N.D Ga. 2010).

The application of this test here dispels any dispute as to whether there is a likelihood of confusion. First, Plaintiffs' longstanding, continuous use of the TOP and JOB marks for 100+ years, coupled with millions of dollars in advertising and sales under the marks enhances their strength. (Dkts. 195-2 ¶¶ 11–14, 30; 211-2 ¶¶ 11–14, 30.) Plaintiffs also sell genuine TOP® and JOB® cigarette papers to several customers in the Atlanta area where Star is located. (Dkts. 195-2 ¶ 16; 211-2 ¶ 16.) Second, Defendants offered and sold counterfeit papers using identical marks, which Defendants admit appeared genuine. (Dkts. 195-2 ¶ 179; 211-2 ¶ 179.) Third, Defendants used Plaintiffs' mark to sell nearly identical products—cigarette papers. (Dkts. 195-2 ¶¶ 31, 66; 211-2 ¶¶ 31, 66.) Fourth, Defendants' and Plaintiffs' customers are nearly

identical (retailers and wholesalers).  (Dkts. 195-2 ¶¶ 29, 60; 211-2 ¶¶ 29, 60.)  Fifth, both Plaintiffs and Defendants advertise through attendance at trade shows and print advertising.  (Dkts. 195-2 ¶¶ 30, 68; 211-2 ¶¶ 30; 68.)  Sixth, the marks used in Defendants' products are virtually identical to the genuine marks.  *See Vineyard Vines, LLC v. Outlet Tent Sales, LLC*, No. 3:19-cv-36, 2019 WL 8277260, at *4–6 (N.D. Ga. Sept. 10, 2019) (finding likelihood of confusion where defendants used plaintiffs' actual marks); *Chanel, Inc. v. Bryan*, No. 1:07-CV-225, 2008 WL 11336327, at *4 (N.D. Ga. Nov. 18, 2008) ("Given that the marks used in Defendant's products are virtually identical to the Chanel Marks . . . Plaintiff has presented a compelling case" of likely confusion).  While there is a dispute about whether Defendants copied Plaintiffs' marks to confuse potential buyers—that is Defendants' intent to misappropriate Plaintiffs' goodwill—the other factors weigh in Plaintiffs' favor.  Based on the foregoing analysis, the only reasonable conclusion is that Defendants' sale of counterfeit products likely confused consumers. "Although not all factors of the likelihood of confusion test conclusively point to a likelihood of confusion in this case, it nonetheless would be unreasonable not to conclude on the basis of the analysis of the factors *in*

*toto* that the likelihood of confusion was very strong." *Churchill Downs Inc. v. Commemorative Derby Promotions, Inc.*, No. 1:12-cv-517, 2013 WL 5350830, at *11 (N.D. Ga. Sept. 23, 2013) (emphasis in original). Consumers would likely have believed Plaintiffs approved or produced Defendants' products.

Although Plaintiffs have shown an absence of genuine dispute that they own valid marks entitled to protection, Defendants used Plaintiffs' marks in commerce, and Defendants' counterfeit marks are likely to cause consumer confusion, Defendants argue Plaintiffs are not entitled to summary judgment because there are factual issues (1) "as to the counterfeit nature of the products" and "intent" and (2) on Defendants' laches, acquiescence, and unclean hands affirmative defenses. (Dkt. 204 at 2, 18, 23–26.)

Defendants contend there are factual disputes as to what is and is not counterfeit. (*Id.* at 3.) They argue one of Plaintiffs' "experts" (Mr. Malacsina) identified certain papers as counterfeit, when the lab ultimately determined they are was genuine. (*Id.*) Defendants assert "[t]his greatly weighs against Plaintiffs' argument that Defendants 'should have known' the papers were counterfeit." (*Id.*) But Plaintiffs

provided sufficient evidence to confirm Defendants sold counterfeit papers.  (Dkts. 195-2 ¶¶ 94, 102, 116–17, 126–31, 140–45, 149–52, 158–60, 171, 173–78, 197; 211-2 ¶¶ 94, 102, 116–17, 126–31, 140–45, 149–52, 158–60, 171, 173–78, 197.)  Their contention that some seized products were visually identified as potentially counterfeit but later tested as genuine does not cancel out the evidence that some products tested as counterfeit.  Mr. Malacsina's misidentification of *some* products thus does not preclude summary judgment.  Ms. Rosarde's and Ms. Teisseyre's reports confirm some of Defendants' products are counterfeit.  The Court also notes Mr. Malacsina, Ms. Rosarde, and Ms. Teisseyre all agreed that certain products are counterfeit.  The quantity of counterfeit products may go to damages.  But in the light of the undisputed evidence that Defendants sold counterfeit products, a disagreement as to the extent of the infringement does not preclude summary judgment.

Defendants also try to create a dispute by alleging they did not *know* the products were counterfeit.  But it is well-settled that "under the Lanham Act, sellers of counterfeit products bear strict liability."  *River Light V, L.P. v. Tanaka*, No. 17-22843, 2018 WL 5778234, at *7 (S.D. Fla. Nov. 2, 2018).  "Good faith is not a defense to trademark infringement."

34

*Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985).  Defendants' contentions about their innocent intentions are irrelevant to their liability.

Defendants argue Plaintiffs are not entitled to summary judgment because there are material disputed facts about their affirmative defenses—acquiescence, laches, and unclean hands.  (Dkt. 204 at 23–26.) Because a defendant bears the burden of proof on any affirmative defenses at trial, *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550– 51 (11th Cir. 1990), on a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable.  *Weitz*, 913 F.2d at 1552; *see also Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (finding because the plaintiffs moved for final summary judgment, it was incumbent on the intervenors to respond by raising any and all defenses they felt precluded judgment in the plaintiffs' favor).  Upon such a showing, the burden shifts to plaintiff regarding that affirmative defense. *Weitz*, 913 F.2d at 1552 n.13.

### a.  Laches

Estoppel by laches may be raised as an equitable defense to trademark infringement when a party has unreasonably delayed in bringing its claims. *Kason*, 120 F.3d at 1203. To prevail on this defense, Defendants must show: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Id.* (citing *AmBrit. Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)). The test for laches is flexible, "requiring a careful examination of both the delay and the prejudice caused by that delay." *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1517 (11th Cir. 1984). "Laches is invoked when the delay in commencing a lawsuit exceeds the statute of limitation for an analogous state law claim, which for this trademark action is the four-year limitation period applied to an action under the Georgia Deceptive Trade Practices Act." *Groucho's Franchise Sys., LLC v. Grouchy's Deli, Inc.*, 683 F. App'x 826, 829 (11th Cir. 2017). "Delay is measured from the time the plaintiff knew or should have known that it had a provable claim for infringement, but it is under no obligation to sue until the likelihood of confusion looms large." *Buccellati Holding Italia SPA v. Laura*

36

*Buccellati, LLC,* 5 F. Supp. 3d 1368, 1375 (S.D. Fla. 2014) (citing *Kason*, 120 F.3d at 1206). Courts weigh the amount of prejudice defendants suffer against the public interest in avoiding confusion. *See id.* (citing *Conagra,* 743 F.2d at 1517).

There is a dispute as to the first element—delay. Defendants suggest the notice period began in early 2018. (Dkts. 211-1 ¶¶ 39, 90, at 39–40; 224 ¶¶ 39, 90; 193-1 at 145; 189-1 at 195.) Plaintiffs suggest the period began in January 2019. (Dkts. 195-2 ¶ 103; 211-2 ¶ 103.) Plaintiffs filed this action on May 15, 2019. (Dkt. 1.) Even using Defendants' date as the starting point, Plaintiffs filed their complaint less than one and a half years after receiving notice of Defendants' counterfeiting activities—well within the four-year limitation period. There is thus a "strong presumption . . . that laches is inapplicable." *Angel Flight of Ga., Inc. v. Angel Flight SE, Inc.*, 424 F. Supp. 2d 1366, 1370 n.5 (N.D. Ga. 2006) ("*Angel Flight*"). But because there is only a presumption, the Court addresses the other two elements—unexcusable delay and undue prejudice.

In determining whether delay is "excusable," a court must not "limit itself solely to a raw calculation of the time period . . . the court should

also examine the *reasons* for any delay." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1345 (11th Cir. 1996) (Birch, J., concurring) (emphasis in original).  Plaintiffs contend that, upon receipt of the January 2019 tip, they promptly investigated the claim, conducted test buys, performed laboratory testing, and cooperated with the police investigation and raid.  (Dkt. 223 at 17–18.)  While the delay from January 2019 through May 2019 may be deemed excusable, both parties fail to account for all of 2018.  Under the doctrine of progressive encroachment, "delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement." *Kason*, 120 F.3d at 1206; *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.19 (4th ed. 1997) ("The senior user has no obligation to sue until the likelihood of confusion looms large. . . .") (quotations omitted).  Because there is no evidence of what occurred during 2018, the Court cannot determine when Plaintiffs knew or should have known they had a provable claim.  The Court agrees there is thus a genuine dispute on whether Plaintiffs' delay was excusable.

Defendants are nevertheless entitled to summary judgment because Defendants have presented no evidence of undue prejudice. *See Tim Hortons USA, Inc. v. Tims Milner LLC*, No. 18-cv-24152, 2019 WL 7376733, at *8 (S.D. Fla. Oct. 17, 2019) (finding the plaintiffs entitled to partial summary judgment as to liability in part because the defendants did not offer evidence to support their affirmative defense); *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) ("[S]ummary judgment is appropriate where the defendant fails to come forward with evidence sufficient to dispute an element of the plaintiff's case or to support an affirmative defense.") (citing *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 804 F.2d 1577, 1580 (11th Cir. 1986) (affirming summary judgment for plaintiff), *reh'g granted and rev'd on other grounds*, 811 F.2d 565 (11th Cir. 1987)).

"Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Quest De La France*, 245 F.3d 1359, 1362 (Fed. Cir. 2001). Defendants argue they suffered undue prejudice because they

continued to buy the pertinent products, believing they were genuine.[15]

(Dkt. 204 at 24.)   The Court, persuaded by authority from the Third

Circuit and Middle District of Florida, finds a defendant's continued sale

of infringing goods during a period of delay does not constitute undue

prejudice.   *See Jenn-Air Corp. v. Penn Ventilator Co., Inc.*, 464 F.2d 48,

49–50 (3ʳᵈ Cir. 1972) (holding no prejudice occurred where "all that

happened to [the defendant] was its continuance of counterfeiting and

selling its infringing products"); *Alfred Dunhill of London, Inc. v. Kasser

Distillers Prods. Corp.*, 350 F. Supp. 1341, 1368 (E.D. Pa. 1972) ("[T]he

defendant has suffered no prejudice where nothing more is shown than

that it has continued to sell the infringing product for the period in

question."); *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, 868 F. Supp.

2d 1350, 1366 (M.D. Fla. 2012) ("[M]ere expenditures in promoting,

advertising, and/or selling an infringing mark does not constitute undue

---

[15] Defendants cite no evidence for their assertion of undue prejudice. They simply make the conclusory statement that "Plaintiffs' actions prejudiced Defendants. Defendants continued to buy the Pertinent Products, believing they were genuine."  (Dkt. 204 at 24.) That is not enough.

prejudice for the purpose of laches.").  Defendants have thus failed to present a dispute of fact about undue prejudice.[16]

### b.   Acquiescence

Acquiescence is an "equitable defense that denotes active consent by a senior user to another's use of the mark."  *SunAmerica*, 77 F.3d at 1334 (citation omitted).  The elements of this defense are "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice."  *Id.* "The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991); *see also ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67–68 (2nd 2002) ("Although 'both acquiescence and laches connote consent by the

---

[16] The existence of laches, even if proven, would not prevent the issuance of injunctive relief to prevent further acts of trademark infringement. Even in cases where laches bars a suit for damages due to inequity to the infringer, the Court may still grant injunctive relief to avoid "putting a judicial stamp of approval on conduct which will confuse customers."  6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.10 (4th ed. 1997).

owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent.'" (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 460, 462 (4th Cir. 1996))). Active consent does not mean an explicit promise not to sue. Rather, "[i]t only requires 'conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1282 (11th Cir. 2012) (quoting *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 547–48 (10th Cir. 2000). "Given the strong interest in preventing public confusion, however, a plaintiff's apparent acquiescence . . . does not necessarily bar relief." *ProFitness Physical Therapy*, 314 F.3d at 68. "When inevitable confusion occurs in the marketplace due to unrestricted dual use of a trademark, the paramount value of the public interest demands some adjustment to the status quo," even in cases involving acquiescence. *SunAmerica*, 77 F.3d at 1337; *see also Coach House Rest.*, 934 F.2d at 1564 ("[I]f there is an inevitability of confusion, [a] petitioner's law suit may be revived from estoppel").

Defendants contend a jury could conclude Plaintiffs led Star to believe the papers Star bought and sold from TN Vape and Birmingham Wholesale were authentic because Plaintiffs' agents visited their warehouse regularly and never identified any counterfeit or suspicious papers. (Dkts. 204 at 24; 211-1 ¶¶ 11, 18, 32–33, 36, 38, 80, 102; 224 ¶¶ 11, 18, 32–33, 36, 38, 80, 102.) Perhaps. The Court, however, is unwilling to find the particular evidence before it sufficient to raise an issue of material fact as to active representation, given the undisputed evidence that distinguishing between counterfeit and genuine papers is extremely difficult and that neither Mr. Hinton nor Mr. Sierra were trained to make such a determination, particularly in the absence of evidence as to the purpose of their inspection or Defendants' understanding as to whether they were inspecting products for authenticity purposes. The Court need not rule absolutely on this issue because, as already explained, Defendants have failed to raise a material dispute as to prejudice.

And even if an issue of material fact existed as to acquiescence, that defense would not prevent injunctive relief. "Upon a showing that 'inevitable confusion' arises from the continued dual use of the marks, a senior user's claim may be revived from estoppel." *SunAmerica*, 77 F.3d

at 1334; *see also Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) ("*Angel Flight II*") ("Laches and acquiescence are inapplicable to the facts of this case because the public is confused. . . . Laches or acquiescence do not preclude the Court's issuance of an injunction to prevent further acts of trademark confusion by [defendants].").  The standard for finding an inevitability of confusion is "an increment higher" than the standard for finding a likelihood of confusion.  *Coach House Rest.*, 934 F.2d at 1564.

It is met here.  There can be no question that confusion is inevitable. Defendants, including one of the largest wholesalers of cigarette papers in the Southeast and someone who has been the sole owner of that business for 14 years, repeatedly admit the counterfeit goods appeared genuine.  (Dkts. 211-1 ¶¶ 78, 80–81; 211-2 ¶¶ 6, 61, 66, 97, 179, 190.) Defendants further admit "the testimony from all of the wholesalers in this action was that they could not tell the products were counterfeit" and a lab analysis was necessary to identify counterfeit papers.  (Dkt. 211-1 ¶¶ 78, 81.)  "Defendants admit that they, as consumers purchasing the allegedly counterfeit products, believed them to be genuine."  (Dkt. 211-2 ¶ 190.)  If people in the business with decades of experience contend the

counterfeit products appear genuine, confusion in the marketplace is inevitable. Defendants' defense of acquiescence thus does not bar injunctive relief.

### c.  Unclean Hands

Proof of "unclean hands" may bar a plaintiff's claim if the plaintiff bears responsibility for its own injury. *See Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015). Generally, "[t]o assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Id.* (citing *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993)); *see also DS Waters of Am., Inc. v. Fontis Water, Inc.*, No. 1:10-CV-0335, 2012 WL 12873771, at *24 (N.D. Ga. Sept. 13, 2012) (applying the unclean hands doctrine in context of a Lanham Act claim), *amended by*, No. 1:10-CV-0335, 2012 WL 12873620, at *24 (N.D. Ga. Dec. 4, 2012). "The defense of unclea[n] hands applies to a Lanham Act claim and is established by a showing that 'the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claim.'" *DS Waters of Am.*, 2012 WL 12873771, at

*24 (quoting *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 258 F.R.D.

663, 665–66 (W.D. Wash. 2009)).  The Supreme Court made clear

> when the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representations; that if the plaintiff makes any material false statement in connection with the property which he seeks to protect, he loses the right to claim the assistance of a court of equity; that where any symbol or label claimed as a trademark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th

Cir. 1983) (quoting *Worden & Co. v. Ca. Fig Syrup Co.*, 187 U.S. 516, 528

(1903)).   "[I]n trademark infringement actions, courts have required

clear, convincing evidence of egregious misconduct before invoking the

doctrine of unclean hands."  *DS Waters of Am.*, 2012 WL 12873620, at

*24.  "[T]he application of the doctrine of unclean hands in a trademark

case lies within the sound discretion of the district court."   *Ron*

*Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547,

1553 (11th Cir. 1989).

Defendants assert several arguments in support of their unclean hands defense. They argue, for example, that Plaintiffs continued selling product to Star (and even signed Star up for its rewards program) while also investigating Star for trademark infringement. (Dkts. 204 at 26.) Defendants, however, present no evidence they were harmed by this and no reasonable jury could find an injury from being allowed to purchase authentic products directly from the manufacturer. *See DS Waters of Am.*, 2012 WL 12873771, at *24 ("[T]he defendant must show that it was personally injured by the conduct at issue.") The same is true for allowing Star to participate in the rewards program.

 Defendants also contend Plaintiffs have unclean hands because they "**actively** permitted Star to continue to sell infringing products, presumably hoping to increase Plaintiffs' damages." (Dkt. 204 at 26 (emphasis in original).) Defendants fail to argue which actions, taken while investigating, were egregious. Defendants may be relying (again) on the fact Mr. Hinton and Mr. Sierra never raised a concern about counterfeit product. But (again) neither man identified counterfeit product or was trained to do so. (Dkts. 211-1 ¶¶ 36, 38; 224 ¶¶ 36, 38; 193-1 at 43:6–18; 189-1 at 45:24–46:2, 51:9–12.) Defendants may also be

relying on their argument Plaintiffs did not react fast enough to the alleged counterfeiting since they received a tip in February 2018 but did not sue until May 2019. (Dkts. 211-1 ¶ 39 n.1; 224 ¶ 39; 193-1 at 145; 189-1 at 195.) Defendants, however, also claim no evidence suggests the February 2018 tip was valid. (Dkt. 211-1 ¶ 39 n.1.) The Court is thus unsure what action they expected from Plaintiffs. It is also undisputed that Plaintiffs began investigating after a January 2019 tip, an action antithetical to the notion of unclean hands. (Dkts. 195-2 ¶ 104; 211-2 ¶ 104.) *See Johnson & Johnson and Lifescan, Inc. v. South Pointe Wholesale, Inc.*, No. 08-CV-1297, 2014 WL 12558573, at *29 (E.D. N.Y. Apr. 4, 2014) ("If plaintiffs learned of counterfeiting and conducted no investigation, made no report to appropriate regulatory authorities, and took no responsive measures, defendants' equitable defenses might well persuade me to recommend that plaintiffs be denied any recovery. However, even defendants concede that plaintiffs communicated with government authorities who were aware of counterfeit test strip packaging, conducted some investigation of the source of the counterfeits, and took some remedial measures after discovering the identity of some of the actors involved in the counterfeiting."). Likewise Plaintiffs'

undercover purchases and cooperation with police involvement do not suggest egregious conduct.

No reasonable jury could find from the undisputed evidence Plaintiffs' alleged delay in filing suit was so egregious as to warrant a defense of unclean hands. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 256 (S.D. N.Y. 2012) ("While Gucci did not act promptly to pursue its infringement and dilution claims against Defendants, it explained that it did not do so because its intellectual property enforcement budget was consumed by the fight against counterfeiters. I conclude that this was a tactical choice rather than an 'unconscionable act,' and decline to apply the doctrine of unclean hands to deny Gucci relief."); *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip.*, Ltd., No. 11-CV-726, 2013 WL 4409434, at *28 (E.D. N.Y. Aug. 2, 2013) ("Even accepting Tri-State's theory that plaintiffs caused the delay solely to increase their DMCA damages, Tri-State cites no cases to establish that this conduct was so unconscionable as to preclude any recovery whatsoever under the unclean hands doctrine.") *report and recommendation adopted in relevant part by*, 2013 WL 5502852 (E.D. NY Oct. 1, 2013).

Finally, Defendants assert "Plaintiffs themselves established relationships with counterfeiters [Birmingham Wholesale and TN Vape], further showing their unclean hands." (Dkt. 204 at 236.) The undisputed evidence shows Plaintiff established these relationships *after* the relevant time. Birmingham Wholesale became an exclusive distributor after the May 2019 raids and Plaintiffs ███████ with TN Vape after the case was filed and after TN Vape admitted liability, ██████████████ ████████, and agreed to a permanent injunction. (Dkts. 195-2 ¶ 92; 211-2 ¶ 92; 224 ¶ 95; 190-1 at 84:24–85:9; 221-4 at 19:3–17, 20:17–19.) Defendants have not shown these post-filing business decisions caused them any harm. *See DS Waters of Am.*, 2012 WL 12873771, at *24 ("[T]he defendant must show that it was personally injured by the conduct at issue."); *see also Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1263 (S.D. Fla. 2002) ("In the Eleventh Circuit, a defendant attempting to invoke the unclean hands defense must . . . show that it was personally injured by the plaintiffs' conduct."), *modified on other grounds by*, 206 F. Supp. 2d 1270 (S.D. Fla. 2002). It is true that Mr. Patton was purchasing product from Mr. Seriana in 2018. (Dkts. 211-1 ¶ 91, at 42–52; 224 ¶

91.)  But, again, there is no indication these alleged purchases hurt Defendants.

For all of these reasons, the Court concludes there is no genuine issue of material fact regarding Plaintiffs' claim against Defendant Star or as to the inapplicability of Defendant Star's affirmative defenses.  The Court grants Plaintiffs' motion for summary judgment as to Defendant Star.

### 2.    Defendant Hudda's Personal Liability

Plaintiffs argue Defendant Hudda is personally liable for the counterfeiting violations.  (Dkt. 195-1 at 22–24.)  They say there is no dispute of material fact about his liability because he directed, authorized, and supervised the purchase and sale of counterfeit TOP and JOB products.  (Dkt. 223 at 14–16.)  Defendants disagree.  They argue there is a dispute of material fact as to whether Defendant Hudda actively and knowingly caused trademark infringement and was the moving, conscious force in the infringement, thus precluding summary judgment against him.  (Dkt. 204 at 21–23.)

The Lanham Act provides for personal liability.  *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)

("*Chanel*") ("Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act." (citing 15 U.S.C. §§ 1114, 1127; *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19 (5th Cir. 1968))). "If an individual actively and knowingly caused the infringement, he is personally liable." *Id.* "The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Id.* at 1478 n.8 (emphasis in original).

Defendants argue Plaintiffs must show Defendant "Hudda had knowledge of the infringement." (Dkt. 204 at 22.) Eleventh Circuit law, however, does not require specific knowledge of trademark infringement as a prerequisite to individual liability. Instead, the law holds officers personally liable when they actively cause infringement as moving, conscious forces regardless of actual knowledge of infringement. *See Top Tobacco, L.P. v. Panjwani*, Nos. 19-CV-2177 & 19-CV-2148, 2021 WL 1351443, at *4 (N.D. Ga. Mar. 15, 2021).

52

The Eleventh Circuit illuminated the issue in *Chanel*. In that case, the famous designer and seller of luxury goods sued a company and two individuals who were selling handbags and belt buckles with counterfeit Chanel trademarks. *Chanel*, 931 F.2d at 1474. One individual was the president and CEO of the defendant company. *Id.* The other was identified as a business associate. *Id.* The district court granted plaintiff summary judgment against all three defendants on treble damages and attorney's fees, necessarily finding "no genuine issue of fact regarding the knowledge and intent of [defendants]" to violate plaintiff's trademark. *Id.* at 1476. The Eleventh Circuit reversed, finding a material dispute as to whether the individuals (and the company) knew their actions violated plaintiff's trademark. *Id.* at 1477. Despite recognizing a material fact as to each individuals' knowledge and intent, the Court of Appeals still found no genuine issue of material fact as to the president's personal liability. *Id.* at 1478. The Court explained evidence the president owned and operated the company, purchased the counterfeit goods from the supplier, advertised the goods, and operated the showroom from which goods were sold was sufficient to establish his personal liability. *Id.* The *Chanel* court found this in the light of the fact that there was an issue of

material fact as to whether the president knew the goods he sold were counterfeit. *Id.* at 1477. In comparison, the Court of Appeals concluded the plaintiff presented insufficient evidence the business associate was personally liable as he had no ownership interest and was not connected to the purchase or sale of much counterfeit product. *Id.* at 1478. The Court of Appeals explained that evidence of his limited involvement in the business operation might allow a jury to conclude he actively caused the infringement (and thus is personally liable), but there existed a dispute of fact as to the extent of his involvement in the business. *Id.* As part of this, the court warned that merely selling goods does not make a person individually liable. Instead, the court explained, the issue is whether the person "actively caused the infringement as a moving, conscious force." *Id.*

When *Chanel* is read as a whole, it suggests knowledge, for purposes of personal liability, means knowledge of the infringing acts, not knowledge of infringement. "This holding is consistent with other cases in which federal courts have held corporate officers personally liable despite their lack of specific knowledge or intent." *Panjwani*, 2021 WL 1351443, at *2 (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606

(3d Cir. 1978) ("The fact that an officer is acting for a corporation may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility."); *Loxottica Grp., S.p.A. v. Casa Los Martinez Corp.*, No. 1:14-cv-22859, 2015 WL 13776171, at *2 (S.D. Fla. Jan. 30, 2015) ("Whether the officer has knowledge that his acts will result in an infringement is immaterial to his individual liability."); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000) ("Where it is established that the officer is a 'moving, active, conscious force' behind the infringement, '[it] is immaterial whether . . . [he] knows that his acts will result in an infringement.'" (quoting *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988))); *Polo Fashions, Inc. v. Branded Apparel Merch., Inc.*, 592 F. Supp. 648, 652–63 (D. Mass. 1984) (same)).  Some courts have emphasized strict liability applies "without regard to the veil that ordinarily separates officers from their corporations."  *Id.* (citing *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to

piercing the corporate veil."); *Donsco*, 587 F.2d at 606 ("This liability is distinct from the liability resulting from the 'piercing of the corporate veil' as that term is commonly used.")).  Defendant Hudda thus may be held liable without regard to his knowledge of or willful blindness towards infringement as long as he actively caused the infringing acts as a moving, conscious force.

Defendant Hudda is the president of Star and, for about 14 years, has been its owner.  (Dkts. 195-2 ¶ 6; 211-2 ¶ 6.)  He tries to oversee its employees and operations, makes some of the business decisions, and has the authority to enter into contracts on his company's behalf.  (Dkt. 188-1 at 27:10–25; 28:1–29:4.)  He also tries to negotiate pricing but does not always do so.  (*Id.* at 28:16–20.)  Defendant Hudda also tries to get involved in big negotiations and "most of the time" makes decisions about which products to carry.  (*Id.* at 28:21–29:4; 93:24–94:1; 103:5–8.)  He tries to select suppliers but does not always do so.  (*Id.* at 29:5–11.)  He is, however, solely responsible for any exclusive purchasing arrangements.  (*Id.* at 29:12–16.)  Defendant Hudda made the decision to terminate Star's exclusive relationship with Republic.  (*Id.* at 29:12–16, 103:23–24.)

The link between Defendant Hudda and the infringing activities is too tenuous to grant summary judgment. The majority of the facts presented by Plaintiffs simply show Defendant Hudda *tries to be* involved in Star's operations. (*Id.* at 27:10–25, 28:16–20, 93:24–94:1, 28:21–29:4, 103:5–8, 29:5–11.) "Taken together, these facts may be enough from which to infer that [Defendant Hudda] actively caused the infringement. But they are insufficient to establish an absence of genuine dispute, such that no reasonable jury could conclude he did not actively cause the infringement." *Chanel*, 931 F.2d at 1478. The Court thus denies Plaintiffs' motion for summary judgment as to Defendant Hudda.

## B.    Permanent Injunction

Plaintiffs request a permanent injunction against Defendants to end their infringement of the TOP® and JOB® marks. (Dkts. 186 at 4; 195-1 at 33.) Pursuant to the Lanham Act, a district court is authorized to issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable," to prevent violations of trademark law. 15 U.S.C. § 1116(a). Indeed, in "ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day." *SunAmerica*, 77 F.3d at 1336; *see also*

*Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) ("[I]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988))). Plaintiffs are not automatically entitled to an injunction.  To obtain a permanent injunction, Plaintiffs must show: (1) they suffered an irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Angel Flight II*, 522 F.3d at 1208.

Plaintiffs have shown they suffered an irreparable harm,[17] that the balance of hardships warrants a remedy in equity,[18] and that the public interest would not be disserved by a permanent injunction.[19]  Defendants do not even challenge these elements.  (Dkt. 195-1 at 34–35.)  Instead, Defendants dispute whether there is an adequate remedy at law.  (Dkt. 204 at 17–21.)

---

[17] "[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.  Irreparable harm can also be based upon the possibility of confusion." *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990)).  The "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Id.* at 190–91; *see also Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1316 (N.D. Ga. 2017) ("Because the Court found that there is a sufficient showing of likelihood of confusion and that [the defendants'] use of KrossFit in connection to unrelated services dilutes the CROSSFIT® mark, the Court concludes that irreparable harm is established.").

[18] Defendants have no right to use the TOP® and JOB® marks, and "therefore could suffer no legitimate hardship by being forced to stop that which [they have] no right to do." *Crossfit*, 232 F. Supp. 3d at 1317 (quoting *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010)).  Plaintiffs, on the other hand, will suffer damages, such as the dilution of their marks, if Defendants are not enjoined.

[19] The public interest would not be disserved because "the public deserves not to be led astray by the use of inevitably confusing marks." *Angel Flight II*, 522 F.3d at 1209.

Defendants say no adequate remedy at law exists and an injunction is necessary when a defendant is likely to continue infringing a trademark.[20]  (*Id.* at 17.)  They argue it has been nearly two years since Star allegedly sold counterfeit papers and they "did not, have not, and will not knowingly sell counterfeit products."  (*Id.* at 21 & n.8.)  As a result, they say there is no need for an injunction.  For this argument, they cite *In re Circuit Breaker Litigation*, 860 F. Supp. 1453, 1456 (C.D. Cal. 1994), (Dkt. 204 at 18), from which they quote: "If . . . the defendant infringed innocently, ceased before judgment and assured the court that it has no intention of infringing in the future, the public needs no protection. In these circumstances, courts usually deny requests for permanent injunctions." *In re Circuit Breaker*, 860 F. Supp. at 1456.  The Court finds Defendants' argument unpersuasive.  First, Plaintiffs are not required to prove likely repetition of infringement to obtain an injunction.  While it has been nearly two years since counterfeit product was allegedly in Star's warehouse, the reform of Defendants is not irrefutably demonstrated.  *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*,

---

[20] Defendants briefly discuss likelihood of confusion.  (Dkt. 204 at 18–20.) As discussed, Plaintiffs have produced sufficient evidence of likelihood of confusion and irreparable harm.

793 F.2d 1132, 1135 (9th Cir. 1986) ("In this case, the district court refused to grant an injunction because the plaintiffs had not introduced any specific evidence to demonstrate that the defendants would infringe in the future. The court was correct in noting that cessation of unlawful conduct can moot such a dispute, but it failed to recognize that the reform of the defendant must be irrefutably demonstrated and total." (internal quotation marks omitted)); *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp. 2d 449, 457 (E.D. Pa. 2001) ("A movant has no burden to prove likely repetition of the infringement to obtain an injunction."); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) ("[A]n injunction is unnecessary when 'there is *no* reasonable expectation that the wrong will be repeated.'" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added))).  Second, Plaintiffs and consumers are entitled to legal assurances Defendants' counterfeiting will stop.  Defendants contend they "will not knowingly sell counterfeit products," but that is not enough, particularly when Defendants identify no business process to avoid doing so again.  (Dkt. 204 at 21 n.8.)  *See Habersham Plantation Co. v. Molyneux*, No. 10-CV-61526, 2012 WL 13005341, at *2 (S.D. Fla. May 8, 2012) ("The [d]efendants have asserted

that they will not import and sell infringing products. Notwithstanding that assertion, [the plaintiff] is entitled to legal assurances that infringing sales will not continue."). Third, if Defendants intend to stop selling counterfeit products, a permanent injunction will cause little to no hardship. *See id.* ("In light of [the defendants'] professed agreement to stop sales, the hardship to [the defendant] by entry of a permanent injunction is small."); *Dick Bruhn*, 793 F.2d at 1135–36 ("If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [the plaintiff] substantial protection of its trademark."). A plaintiff in a trademark case "is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the [defendant], which has shown by its conduct that it is not to be trusted." *Dick Bruhn*, 793 F.2d at 1135 (quoting *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532 (1924)). Defendants are thus permanently enjoined from infringing the TOP® and JOB® marks.

## IV.  Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion for Summary Judgment (Dkt. 186).

The Court **GRANTS** Plaintiffs' request for a permanent injunction. (Dkt. 186 at 4.)

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.  The parties shall advise the Court of their mediation preference on or before September 21, 2021.  If they elect to retain their own mediator, the parties shall identify the mediator on or before October 5, 2021.  The parties must have present at the mediation a person with authority to settle this litigation.  The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of stay.

**SO ORDERED** this 7th day of September, 2021.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE